STATE OF NORTH DAKOTA EX REL. CITY OF FARGO, a Municipal Corporation, Plaintiff, v. JOHN WETZ, as Assessor of the City of Fargo, a Municipal Corporation in the State of North Dakota, George E. Wallace, H. H. Steele, and Frank E. Packard, as the State Tax Commission of North Dakota and as Members of such State Tax Commission, Defendants.

(5 A.L.R. 731, 168 N. W. 835.)

Motor vehicles — license tax — or fee — in lieu of other taxes — collection of — authorized by statute.

1. Chapter 156 of the Session Laws of 1917 construed and *held* to provide for the collection of a license tax or fee in lieu of other taxes upon motor vehicles.

Legislature — two bills passed at same session — one for classification and taxation of property generally — other dealing with a single species of property — embraced in the general schedule — conflict — must be resolved in favor of bill relating to specific property.

2. Where, at the same session of the legislature, two bills are passed, one providing for the classification of property generally for purposes of

taxation and the other dealing particularly with a single species of prop-
erty which is embraced in the general schedules of the classification act, the
conflict in the two bills must be resolved in favor of that which deals par-
ticularly with the specific property.

**Two bills — approved by governor in the inverse order of their passage —
conflict — theory of repeal by implication — cannot be so resolved.**

3. Where two bills are approved by the governor in the inverse order of
their passage, conflicting provisions therein contained cannot be resolved in
favor of that which was passed last, on the theory of a repeal by implication.

**Taxes — uniformity of — franchises — tax levy — authority to make — public
utilities property — equalization — board of — ad valorem basis — taxa-
tion of all property on — not required — license fee in lieu of general
taxes.**

4. Sections 176 and 179 of the Constitution, as amended in 1914, which
provide that "taxes shall be uniform upon the same class of property, in-
cluding franchises within the territorial limits of the authority levying the
tax," and for the assessment of certain public utility property by the state
board of equalization and other "taxable property . . . , in the county,
city, township, village or district . . . " do not require the taxation of
all property on an ad valorem basis, and are not violated by a law which
provides for the payment of a license fee in lieu of general and local taxes.

**Property exempt from taxation — constitutional provision — statute — does
not violate — governmental functions — owners of certain classes of
property — cost of maintaining — contribution to by such owners.**

5. Section 176 of the Constitution, as amended in 1914, which provides
that the "legislative assembly shall, by general law, exempt from taxation
. . . personal property to any amount not exceeding in value $200 for each
individual liable to taxation," is not violated by an enactment according to
which the owners of a given class of personal property will be compelled to
contribute to the cost of maintaining certain governmental functions an amount
which will approximately equal a fair property tax if levied upon an ad
valorem basis.

**Legislature — plenary control — over taxing power of municipalities.**

6. Under § 130 of the Constitution, the legislature is given plenary control
over the taxing power of municipalities, and § 179 of the Constitution, as
amended in 1914, does not give to local taxing districts the constitutional
right to retain upon their tax lists all of the property within such districts.

**Legislative assembly — raising revenue for state expenses — constitutional
provisions — limitation on power of legislature — to provide state
revenues by ad valorem tax on property — revenues from other sources
— has no application to.**

7. Section 174 of the Constitution, under which the legislative assembly

is directed to provide for the "raising of revenue to defray the expenses of the state, not to exceed in any one year 4 mills on the dollar on the assessed valuation of the taxable property in the state," is a limitation upon the power of the legislature to provide state revenues by the taxation of property upon an ad valorem basis. It has no application to revenues derived from other sources and according to some other method.

**Motor vehicle license act — powers of secretary of state — conferring upon — unconstitutional — legislative powers — attempted delegation of powers.**

8. Following State ex rel. Rush v. Budge, 14 N. D. 532, and State ex rel. Miller v. Taylor, 27 N. D. 77, it is *held* that § 4 of the Motor Vehicle License Act, in conferring upon the secretary of state unlimited power to employ agents and incur expense, is unconstitutional as involving an attempted delegation of legislative power.

**Portion of a law unconstitutional — remainder will stand — where it can reasonably be said legislature would have passed — with objectionable part omitted.**

9. Where a portion of a law is unconstitutional, the remainder will stand where the court can reasonably say that the legislature would have passed the act with the invalid portion stricken therefrom.

On Rehearing.

**Constitutional law — amending the Constitution.**

10. Section 202 of the Constitution of North Dakota, which requires that "if two or more amendments shall be submitted at the same time they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately," is not violated by submitting as one amendment a proposed change which is expressed in two sections, both, however, relating to one general subject and designed to accomplish one main purpose.

It is *held* that the amendments to §§ 176 and 179 of the Constitution, which were submitted to the electors in 1914 as one proposition, relate to the general subject of uniformity of taxation, and that the amendment was legally adopted.

Opinion filed June 14, 1918. On Rehearing August 5, 1918.

Original application for a writ of mandamus.

Writ denied.

*William Langer,* Attorney General, *E. B. Cox,* Assistant Attorney General, and *F. E. Packard,* for defendants and respondents.

*Spalding & Shure* and *E. T. Burke,* for plaintiff.

BIRDZELL, J.  This is an application for a writ of mandamus which will command the defendant Wetz, as assessor of the city of Fargo, to list, assess, and place upon the tax rolls a certain Packard automobile, number 33,646, owned by one A. L. Moody, a resident and citizen of Fargo, which automobile is kept and used by him in said city; also commanding the assessor to list, assess, and place upon the tax rolls other motor vehicles of other descriptions owned, kept, and used by residents of the city of Fargo, so as to subject the same to taxation for the year 1918 as a part of the taxable personal property subject to the taxing jurisdiction of the city.  The order to show cause issued herein is directed to George E. Wallace, H. H. Steele, and F. E. Packard, as members of the State Tax Commission, having supervision of the administration of the tax laws of the state.

In the affidavit and petition, it is made to appear that the city commission of the city of Fargo directed the defendant Wetz to assess the property above referred to, and that Wetz refused to do so, basing his refusal upon chapter 156 of the Session Laws of 1917, the same being an act providing for motor vehicle license fees, registration tax, etc. It is shown that the act contains a provision purporting to make the registration fee (excepting for dealers' licenses) a charge which shall be in lieu of all taxes, general and local.  It is further alleged as a part of the petition "on information and belief that the revenue which has been and will be derived from the registration with the secretary of state and the fee charged therefor, in accordance with the terms and provisions of said legislative act, will exceed by several hundred thousand dollars the expense incident and necessary to the carrying out of the provisions of said legislative act in such registration and in the issuance of licenses thereby provided for, and that, by provisions of said act, revenue which, under the Constitution of the state of North Dakota, belongs to the villages, cities, counties, etc., is diverted therefrom and from use for the purposes for which such taxation is provided; that said act was passed with knowledge that the revenue derived from its operation would exceed by hundreds of thousands of dollars the cost of operating the department having charge of such registration and licensing and all the expenses incident thereto, and with and for the purposes of diverting any revenue to which such corporations were entitled under the provisions of the Constitution

to unconstitutional and illegal purposes, to wit, to the repair and construction of roads in various places in the state of North Dakota and under the jurisdiction and control and management of a board not provided for by said Constitution and having no constitutional authority to expend funds so derived."

It is further alleged that the act in question does not provide for assessing motor vehicles in accordance with their value, but that the fees are based upon arbitrary, inequitable, and unjust distinctions, and that the provisions of the legislative act are not uniform in their operation but are wholly arbitrary and unjustified. It is alleged that, under the provisions of the act, the city of Fargo would receive no part of the revenue derived from the registration tax, and that the motor vehicles of dealers are subject to assessment and taxation like other personal property, while similar vehicles belonging to others are not so subject.

The answer does not put in issue any facts material to the determination of the questions raised upon the application for the writ.

Section 1 of chapter 156, Session Laws of 1917, provides for the form of application for a dealer's license to be issued upon the payment to the secretary of state of $15. Among other things, the application is required to contain a statement of "the amount of such motive power stated in figures of horse power, in accordance with the rating established by the Association of Licensed Automobile Manufacturers, . . . " Section 3, which amends § 2976g of the Compiled Laws of 1913, provides a minimum fee for the reregistration of motor vehicles of not less than $6, and, for those having a higher rating than 20-horse power, an additional fee of 50 cents for each additional horse power,—subject to reduction, however, in the case of vehicles which have been previously licensed for three years. In this section it is provided that "the registration fees imposed by this act upon motor vehicles shall be in lieu of all taxes, general or local, to which motor vehicles may be subject, except, that dealers' license fees shall not be in lieu of other taxes." Section 4, which amends § 2976h, Compiled Laws of 1913, provides: ". . . The secretary of state is hereby authorized to employ such agent or agents as may be necessary to enforce the provisions of this act." Section 5, which amends § 2976n, Compiled Laws of 1913, provides that the

moneys derived shall be paid into the state treasury by the secretary of state, and that the state treasurer shall in turn pay to the various county treasurers to the account of the special road maintenance fund, "one third of the moneys received by him from the secretary of state under the provisions of this act, and shall credit the remaining two thirds to the account of the state highway fund. Provided, however, that the state treasurer shall first deduct from all the moneys received by him from the secretary of state the cost of tags, clerk hire, printing, postage, express, and other expenses as estimated by the secretary of state." Section 6 provides that "the state highway fund provided for by this act shall be expended under the direction of the State Highway Commission." Section 8 provides for the expenditure of the license money for repairing and maintaining all highways, and concludes with the following proviso: "Provided, further, that none of this money shall be expended within the limits of any incorporated city or village." An emergency clause is attached, stating as one of the grounds of emergency that, without the act, there would not be sufficient money available in the state treasury to comply with the requirements of the Federal law providing for Federal aid for the construction and maintenance of roads.

In view of the questions raised upon the argument, it will become necessary, also, to consider certain provisions of chapter 59, and, possibly, of chapter 131 of the Session Laws of 1917. Chapter 59 is an act which provides for the classification of property, for assessment at a percentage of its value, and by § 1 of said act, class 2 of the schedule adopted is made to embrace "all live stock, agricultural, and other tools and machinery, gas and other engines and boilers, threshing machines and outfits used therewith, automobiles, motor trucks, and other power-driven cars, vehicles of all kinds, boats and all water craft, etc." This class of property is required to be assessed at 20 per cent of its true and full value.

Chapter 131 of the Session Laws of 1917 provides for the establishment of a state highway commission which is given general control and supervision of the construction, improvement, repair, and maintenance of roads and bridges, under prescribed limitations. Among other powers granted the commission is the power to expend the state highway fund as follows: (§ 2) ". . . it shall

reserve out of the state highway fund hereby created a sufficient sum annually to meet its expenses and to pay the state's portion of the cost of property maintaining all highways and bridges improved in pursuance of the provisions of this act; and the balance of said state highway fund shall be expended by the State Highway Commission in the improvement of highways and bridges in the several counties in the following manner: Ten per cent of said fund shall be spent within the discretion of the State Highway Commission and without regard to the amount of said fund collected in each county, and 90 per cent shall be spent by the said Commission in the several counties in proportion to the amounts collected therein." In this act several sections dealing with the disposition of the auto license moneys are identical with the sections contained in chapter 156 dealing with the same subject.

Counsel for the defendant, in apparent recognition of the constitutional difficulties in the way of sustaining the act in question, have suggested the possibility of harmonizing chapters 156, 59, and 131 by giving to chapter 156 a construction rendering it consistent with that portion of chapter 59 which places automobiles and power-driven vehicles in class 2 of the assessment schedule, and purports to subject them to ad valorem taxation at 20 per cent of their value. Counsel for the plaintiff manifests agreement to this construction, and professes to be interested solely in being able to subject the class of property referred to to taxation for municipal purposes. There is no appearance in this action on behalf of any owner of a vehicle affected by the legislation under consideration, and consequently no question is raised relative to the prejudicial effect of a construction such as that contended for. While the court should be and is reluctant to adopt a construction of chapter 156 that might render the same unconstitutional, we felt it nevertheless incumbent upon us to adopt a reasonable construction of the act, even though in doing so we should be forced to the conclusion that it is unconstitutional. In short, even in the absence of a representation by a numerous class of persons who would be adversely affected by the construction of the law with which counsel for both parties manifest satisfaction, we cannot adopt a construction that does manifest violence to a clearly expressed intention of the legislature, even for the high purpose of saving the constitutionality

40 N. D.—20.

of the law. We must, therefore, first construe chapter 156 to determine its meaning in connection with the subject of the general and local taxation of the class of vehicles to which it is applicable.

The language of § 3 of the Motor Vehicle License Act (chapter 156) is free from ambiguity and unmistakable in its literal meaning. The legislature has said: "The registration fees imposed by this act upon all motor vehicles shall be in lieu of all taxes, general or local, to which motor vehicles may be subject, except, that dealers' license fees shall not be in lieu of other taxes." In addition to this unambiguous language, the radical increase in the license fee over that which was previously charged, and the comprehensive plan according to which the large amount of anticipated revenue is required to be expended for governmental purposes, is persuasive evidence of an intention on the part of the legislature to make the so-called license fee take the place of both the pre-existing license fee and the personal property tax upon the vehicles. Such evidences of legislative intent are so clear as not to be capable of being overcome by the consideration of a slight difference in the time of passage of the two apparently conflicting provisions, as disclosed by the legislative journals. It is more reasonable to regard the two chapters (156 and 59) as relating to independent subjects and as involving conflict only to a limited extent. One relates to the classification of the general property of the state for tax purposes, while the other deals particularly with a class of property which, for tax purposes, is intended to be segregated from the general mass and treated according to an entirely different plan. Under well-settled rules of statutory construction, the general statute must yield to that which deals specifically with a part of the subject-matter embraced in both.

Had chapter 156 not been enacted, the intention of the legislature to subject motor vehicles to ad valorem taxation at the scheduled rate of valuation would have been clear and unmistakable, but it would be going beyond the bounds of legitimate inference to say that, by the adoption of both chapter 59 and chapter 156, it was the deliberate design of the legislature to negative an intention which clearly lies at the very basis of the License Act. It is only the fact that the License Act was first in order of passage by the legislature that furnishes occasion for the suggestion that the provision making the license tax a

charge in lieu of all other taxes was repealed by chapter 59. Repeals by implication are not favored, and we are satisfied that the doctrine is not properly invoked in this case. Especially is this true here because the two chapters referred to were approved by the governor in the inverse order of their passage. One act cannot repeal another by implication until it becomes a law.

The conclusion above expressed seems to be fortified by the very language of § 1 of chapter 59. This section purports to make the classification schedule adopted applicable only to "real and personal property *subject to a general property tax,* and not subject to any gross earnings or any *other lieu tax."* Clearly, it was not intended that personal property which was not subject to a general property tax should be embraced within the classification scheme, nor was it intended that any property should any longer be embraced therein after it had become subject to taxation in some other form, in lieu of a property tax. That is precisely what is provided for in the Motor Vehicle License Act, and hence a motor vehicle comes directly within one of the exceptions to the classification schedule. The fact that motor vehicles are named, however, in class 2 of the schedule is only evidence to our minds that, owing to the imperfections of legislative procedure and to the impossibility of determining in advance the fate of related legislation, it was thought well to make a class broad enough to provide a proper place in the general schedules in case the legislation dealing specifically with one particular kind of property should not be passed.

We are strongly of the conviction that chapter 156 was intended to authorize a license fee in lieu of all other taxes, and that the act will have to stand or fall as so interpreted. This construction accords with the express language of the act, and to attempt to attach a contrary meaning would be nothing short of trifling with a well-understood legislative intention. We are thus compelled to consider the constitutional objections urged against the validity of the Motor Vehicle Tax Law, treating the same as substituting a graduated license fee in lieu of the combined pre-existing license fee and ad valorem tax.

We are, then, confronted with the question of the power of the legislature to effect such a change in the tax laws under the limitations of the Constitution. In approaching the consideration of the constitu-

tional questions presented by the petitioner, we must do so in the light of the rule that, in the exercise of the legislative power, the will of the legislature is supreme, and cannot be set at naught except where it contravenes restrictions upon the legislative authority that can be pointed out in the Constitution. Cooley, Const. Lim. 7th ed. p. 236. The judicial department of the government exercises no function that is more far reaching in its importance than that of passing upon the constitutionality of legislation, nor one that it approaches with a greater sense of delicacy. Realizing this fact, and being duly conscious of the proper relationship of the co-ordinate branches of the government, the most eminent judges have approached such questions with a degree of solemnity that is not usually present in cases which call merely for the application of ordinary principles of law to controversies between suitors. Some of our most highly respected courts and most eminent jurists have been so reluctant to set at naught the will of a co-ordinate branch of the government that the principles according to which they have tested the constitutionality of statutes are indeed extreme in favor of the giving of effect to the legislative will. Said Chief Justice Shaw, in the case of Re Wellington, 16 Pick. 87–95, 26 Am. Dec. 631: "That when called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." See State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583. While the questions involved in the matter under consideration can scarcely be said to be free from doubt, we enter upon their discussion with a due appreciation of their importance; and, entertaining the desire to give effect, first, to the true meaning of the Constitution, and, second, to the will of the legislature in so far as it may be found not to be in contravention of the limitations prescribed by the Constitution.

The provisions of the Constitution with which we are particularly concerned in this connection are found in article 11, §§ 174, 176, and 179, as amended by chapter 103 of the Session Laws of 1913, the

latter being a concurrent resolution which was adopted as a constitutional amendment in November, 1914. Sections 174, 176, and 179, as they stood prior to the 1914 amendment, provided for what is commonly known as the general uniform property tax. By § 174 the legislative assembly was directed to provide for the raising of revenue to defray the expenses of the state not to exceed in any one year 4 mills on the dollar, on the assessed valuation of the taxable property in the state. Section 176 required the passage of laws "taxing by uniform rule all property according to its true value in money." It also provided for certain exemptions to be created by general law, among which was included "personal property to any amount not exceeding in value $200 for each individual liable to taxation." Section 179, as amended by article 4 of the amendments (1905), provided that all property should "be assessed in the county, city, township, village, or district in which" such roads "are located or through which they are operated, as a basis for the taxation of such property. . . . "

By the amendment which was made in 1914, the basic mandate of universal uniform ad valorem assessment was changed. The amendment provided merely that "taxes shall be uniform upon the same class of property, including franchises within the territorial limits of the authority levying the tax." Sess. Laws 1913, chap. 103. The power of the legislature to exempt property from taxation, however, was expressed in practically the same language as that contained in the original § 176, and, so far as applicable to personal property, reads as follows: "And the legislative assembly shall by a general law exempt from taxation . . . personal property to any amount not exceeding in value $200 for each individual liable to taxation." Sess. Laws 1913, chap. 103. Section 179 was amended (chapter 103, Sess. Laws 1913, § 2) by striking therefrom the provisions requiring an apportionment of the assessed valuation of public utility properties to local municipalities.

Being reminded at this point of the effect of the Motor Vehicle License Law to remove from motor vehicles the burden of general and local taxation, we are required to answer the inquiry whether it is competent for the legislature to strike from the tax rolls of local municipalities property not legally exempt, and thus deprive them of

sources of revenue which, it is contended, are secured to them by the Constitution.

Without holding or meaning to intimate that the only source of revenue that would have been open to the state and its governmental subdivisions, under the provisions of article 11 of the Constitution as it originally stood, was a tax derived from property uniformly assessed (State v. Klectzen, 8 N. D. 286, 78 N. W. 984, 11 Am. Crim. Rep. 324), we have no doubt that it was intended that such should be at least the principal source of revenue. The constitutional provisions were mandatory. They required the passage of laws designed to subject all property to taxation according to value. This was an expression of the belief prevalent at the time of the adoption of the Constitution, that the ends of justice were best served where contributions to the support of the government were in proportion to ownership of property, at least in so far as it may be attempted to derive revenues from property taxes. This idea was as applicable to revenues for the support of local government, as for the state government. It was thus made an integral part of the plan that all the property once assessed should be subjected to the property taxes required for the support of the minor municipalities. Any attempt to give property a situs other than its true local situs would of course have interfered with the plan and would have been unconstitutional. Martin v. Burleigh County, 38 N. D. 373, 165 N. W. 520; Rosasco v. Tuolumne County, 143 Cal. 430, 77 Pac. 148. The genius of this scheme of taxation could only be realized if the properties subject to tax, either state or local, were upon the tax list of the district in which the property was located and the taxes levied. It was the *sine qua non* or basic practical requirement that must exist coextensively with the power to tax property by whatever municipality that was made the recipient of the power. Thus, it will be seen that the requirement of localization contained in § 179 was a necessary part of the idea that all contributions to the revenues derived from property taxes should be exacted according to the valuation of the property. It would have been the law of the state by reason of § 176, though § 179 had not been adopted.

Viewed in this light, which we believe reflects its true meaning, the requirement of localization expressed in § 179 was only the expression of a rule that it was necessary to follow if the goal of general uniform-

ity was to be realized, and it may properly be regarded as merely appended to the more important section preceding. (§ 176.)

Apart from the incidental effect of the original § 179, construed in conjunction with § 176, we are of the opinion that there was a most important reason for the adoption of the section. It gave to the state board of equalization the sole power to assess the enumerated public utility properties. This power was doubtless conferred upon a central board in order to obviate conflicts between local taxing authorities, each taxing portions of the same property. It will be noted that the properties affected are those which generally extend into and through a large number of taxing districts. In the light of this fact, it was thought that the best means of securing uniform valuation, and of avoiding complications incident to the attempted exercise of authority by numerous local units, was through the medium of a central assessment. We do not doubt that this affords the strongest, if not the sole, reason, for the adoption of § 179. So important is this consideration that the supreme court of California, in construing a similar constitutional provision, was divided upon the question as to whether or not it should be extended by implication to cover assessments of street railways and interurban lines operating in more than one county. San Francisco & S. M. Electric R. Co. v. Scott, 142 Cal. 222, 75 Pac. 575.

In view of the fact that the constitutional provisions designed to perpetuate the plan of property taxation above discussed have been superseded by amendment, it may not be out of place to refer briefly to the views entertained by economists relative to the efficiency of the scheme as a just method of taxation. While we are not primarily concerned with the economics of the question and express no opinion thereon, reference to the current views of such authorities may conduce to a better understanding of the amendment. It is only reasonable to assume that the amendment was made with a view to correcting inherent defects. A foremost authority on the subject of taxation in the American states condemns the general property tax both from the theoretical and practical standpoints, and, in pointing out wherein it has signally failed as administered, says: "The standard of ability has been shifted from property to product; *the test now is not the extent, but the productivity, of wealth.* . . .

"Practically, the general property tax as actually administered is beyond all doubt one of the worst taxes known in the civilized world.

Because of its attempt to tax intangible as well as tangible things, it sins against the cardinal rules of uniformity, of equality, and of universality of taxation. It puts a premium on dishonesty and debauches the public conscience; it reduces deception to a system and makes a science of knavery; it presses hardest on those least able to pay; it imposes double taxation on one man and grants entire immunity to the next. In short, the general property tax is so flagrantly inequitable that its retention can be explained only through ignorance or inertia. It is the cause of such crying injustice that its alteration or its abolition must become the battle cry of every statesman and reformer." Seligman, Essay in Taxn. p. 61. See also Wells, Theory & Pr. of Taxn. p. 434.

Counsel upon the argument referred to the general property tax as being of comparatively recent origin, and to the amendment as harking back to a period when legislatures were more free than now in the matter of tax legislation. In this, counsel was only partially correct. The general property tax is medieval, not modern. When the organization of society was simple, the general property tax so strongly reflected the semblance of equality that it was quite generally adopted. But it has been so long discarded in continental Europe and in the eastern states of America that it usually receives but passing mention by those who devote attention to public finance. When it is mentioned it is only to be condemned for its utter failure to achieve the desired ends of justice and equality.

To what extent has the original scheme, which in practice has proved so disappointing, been departed from by the adoption of the amendment above referred to, It will be noted first that § 176 no longer commands the legislature to provide for the taxing of all property by uniform rule, according to its true value. On the contrary, the section purports to be only a limitation designed to preclude arbitrary classification, and to require uniformity only within a class and within the territorial limits of a taxing authority. Section 179, as now amended, while retaining the pre-existing requirement of local assessment, except as to enumerated public utilities, entirely does away with the necessity for a distribution of the assessed value of utility properties to the local taxing units. These two sections of the amendment of 1914 are significant of a decided change in the pre-

existing constitutional policy. It is now neither required that all of the taxable property within a district shall be apportioned thereto, nor that the revenues to be raised from property taxes within the territorial jurisdiction of the municipality levying the tax shall be derived from all of the taxable property within the district. For instance, it may now be provided that the state may derive its tax revenue from railroads and express companies to the exclusion of other property; whereas minor municipalities may be authorized to derive their revenues from the general property including such utilities as telephone and telegraph companies, and be denied the right to tax the railroads and express companies. The effect of such a law would, of course, be to exempt the class of property referred to, wholly or in part, from other taxes for the support of other municipalities in which the property may be located; but in reality the property would not be exempt, because it would be bearing that portion of the general burden of taxation which the legislature deemed just. The only limitation upon the power of the legislature to thus classify property is the 14th Amendment to the Federal Constitution, which, by requiring equal protection of the laws, precludes purely arbitrary classification. See Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 33 L. ed. 892, 10 Sup. Ct. Rep. 533; Santa Clara County v. Southern P. R. Co. 9 Sawy. 165, 18 Fed. 385; American Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 45 L. ed. 102, 21 Sup. Ct. Rep. 43; Kidd v. Alabama, 188 U. S. 730, 47 L. ed. 669, 23 Sup. Ct. Rep. 401; Cook v. Marshall County, 196 U. S. 261, 49 L. ed. 471, 25 Sup. Ct. Rep. 233; Citizen's Teleph. Co. v. Fuller, 229 U. S. 322, 57 L. ed. 1206, 33 Sup. Ct. Rep. 833; State ex rel. St. Paul City R. Co. v. Minnesota Tax Commission, 128 Minn. 384, 150 N. W. 1087. Under such a scheme, property cannot be said to be exempt, provided it is made to bear what the legislature deems to be its just proportion of tax burden. The foregoing propositions based on the amendment are wholly beyond dispute because clearly within its very language.

But does the requirement that all taxable property except that of the enumerated utilities shall be assessed in the county, city, township, etc., in which it is situated, any longer require that all taxable property not excepted be placed upon the tax rolls of the designated local units? If so, the legislature has no authority to effect its withdrawal.

This, in our judgment, is a most serious question, and one that must be solved by a proper construction of the constitutional amendment in the light of the change sought to be effected.

As an aid in determining the meaning of the amended § 179, it should be borne in mind that § 202 of the Constitution requires the separate submission of amendments so that they may be separately voted upon, and that chapter 103 of the Session Laws of 1913, which amends both §§ 176 and 179, was adopted as one amendment. We should assume, therefore, that it was desired to effect but one basic change in the Constitution, and that whatever alterations in other sections were deemed essential to make that change effective were made for that purpose only. The basic change sought is doubtless found in § 176, wherein the rule of general uniformity is changed to that of a permissive classification accompanied by a requirement of territorial uniformity. The change made in § 179 by removing the direction to apportion the assessed valuation of the utilities to the local units but brings it into harmony with § 176. Where a single purpose seems to be dominant in an amendment, we should be reluctant to give to other sections a construction that would tend to defeat it; particularly where the section which is not wholly consistent in its language was but a little more than an appendage to that which was most radically changed.

Under its authority to classify, the legislature may determine that there are subjects of tax within a given locality that may reasonably be made to contribute to the maintenance of one municipality rather than to another, both having jurisdiction over the same territory. Thus, it may be thought more appropriate for a county or for the state, either of which may be charged with the duty of keeping up the public highways, to exact of an automobile stage driver the taxes derived from the instrumentalities that he uses in connection with his business, than it would be to permit the city, where he might sleep half the time and over whose streets he might run but a short distance, to derive a larger benefit from his taxes upon the automobiles he uses than the county or state.

Or the legislature might deem it proper to authorize the creation of a park commission or board, and vest it with authority to levy a tax for the acquisition and improvement of park sites. If it should be of

the opinion that such a tax should be levied only upon the assessed valuation of the real property of a city whose boundaries correspond with the jurisdiction of the board, manifestly it could so provide, under § 176. (Assuming, of course, the constitutionality of the classification involved under the equal protection clause of the Federal Constitution.) If § 179, as now amended, however, were construed to require the placing of all taxable property within the city or park district upon the tax rolls, its presence there could serve no useful purpose because not accompanied by a power to tax. Or would it be contended that there must be a local power to tax it, because it is incompetent for the legislature to so far exempt it? If so, the legislature would be driven to the adoption of indirect means to accomplish its permissible ends. It could provide for an assessment for local purposes on so low a basis as to amount practically to an exemption from local taxation. If such an expedient were resorted to to effect a legitimate object, and it did not amount to arbitrary classification, it would not be for the courts to question the wisdom of the policy or the good faith of the legislature. We should shrink from a construction of the Constitution that can but result in imposing artificial rules so readily capable of being circumvented. Rather we should seek to discover the true aim of each provision and apply it according to its intent and spirit.

The true aim of the original §§ 176 and 179 was to compel an equitable distribution of the tax burden. This they sought to accomplish by requiring a uniform ad valorem assessment of all property and the application of the local and general tax rates thereto. The aim of the amendment is doubtless the same, but we must construe it as made in the light of the universal experience above referred to. It contemplated that the legislature might take cognizance of the economic setting of the various classes of property subject to its taxing authority, and consider this as a factor in legislating regarding the peculiar functions of the different municipalities and the duty of supplying the needed revenues to support them. If this be not the scope of the amendment, why was the requirement of uniformity limited to "the territorial limits of the authority levying the tax," and why was the constitutional form of expression changed from language strongly mandatory to permissive freedom within limited bounds? If, under § 150 of

the Constitution, the legislature is precluded from differentiating between the various classes of property in a way that will reflect a just appreciation of economic and governmental relationships, manifestly the constitutional foundation for reasonable classification is undermined, and there is carried over into the altered scheme so large a part of the pre-existing iron-clad rule of uniformity as to afford a serious impediment to its reasonable and orderly operation.

In its essence, the objection interposed in this case on behalf of the city of Fargo amounts to a complaint that its taxing power is impaired, but, by § 130 of the Constitution, the legislature is given plenary control over municipalities in the matter of the limitations upon their taxing power. In fact, their power to tax is derived from legislative grant. State ex rel. Oliver Iron Min. Co. v. Ely, 129 Minn. 40, 151 N. W. 545, Ann. Cas. 1916B, 189. If, under § 176, a new municipality can be given a limited taxing power, or one that will enable it to tax certain classes of property for certain purposes, wherein can there be any sound basis for objection on the score that the taxing power was not made more extensive? It may be that, under § 176 as it originally stood, all power to tax property must have been so conferred as to operate uniformly as to all property within the district; but without the requirement of such uniformity, can it be reasonably said that every taxing power vested in a municipal government must be accompanied by authority to tax all taxable property according to some rate for the same purpose? A rate which would be nominal merely and wholly artificial might be thought to satisfy the constitutional requirement.

Enough has been said to indicate that constitutional localization of property for purposes of taxation is inherently inconsistent with the legislative power to classify. But, does the language of § 179 require that we should give effect to a meaning so far inconsistent with § 176? We think not. When the entire amendment is read together we think it reasonably clear that the effect of § 179 is simply to provide that property which is required to be taxed for local purposes be given a situs within the district in which it is to be taxed, and that certain properties shall be assessed by the state board of equalization. The word "taxable" qualifies "property" in the amended section, whereas there was no qualifying word in the original section. This would seem

to imply that it was contemplated that some property might be made taxable in one jurisdiction that was not taxable in another. While the addition of this qualifying word may in itself be of slight consequence, yet when we also consider the dropping of the only words expressly requiring the valuation of property to be apportioned to the taxing districts, and read the whole amendment in the light of the meaning of the newer limitation, which displaces a stiff mandatory provision, we are impressed that the localization only applies to property which is required by the legislature to bear a local tax.

Being of the opinion that the complaint of the city of Fargo is unwarranted in so far as it is predicated upon a right to retain the property in question upon its tax rolls, it remains to be determined whether the act so operates as to exempt personal property in violation of § 176 of the Constitution, or to circumvent § 174, limiting the amount of state taxes.

It is incompetent for the legislature to exempt personal property from taxation except to the extent of $200 worth for each individual liable to taxation. This act imposes a charge denominated a license or registration fee. Does it necessarily violate the provision above referred to? It is clear, as hereinbefore pointed out, that the legislature intended that the property in question should bear no other tax burden than that provided in this law. The amount required to be paid entitles the owner to enjoy the right to use the highways and to hold his property free from other tax obligations. Doubtless, it would be competent for the legislature, in imposing a license tax, to take into consideration the uses commonly made of the property affected, together with the additional burdens which such uses place primarily upon the state. The duty of keeping the public roads in condition is a governmental one which, under our Constitution, the state is now authorized to discharge directly. Const. § 185, Sess. Laws 1915, p. 403. Where a fee or tax may fairly be said to be no larger than is reasonably necessary to compensate for the extra burden incident to the common use of the highway by a given class of vehicles, it cannot be said to be so arbitrary as to be unwarranted. There being no provision in the Constitution directly restricting the power of the legislature to impose a license fee or tax, the charge imposed, having been measured accord-

ing to a reasonable standard, seems to meet every requirement of a valid license tax.

But unless it is included in the fee, there cannot be said to be any tax upon the property, and the act cannot stand because of the express provision of § 176, limiting the power of the legislature to exempt property from taxation. Can it be said that the legislature, by determining upon a policy of substituting a license fee for a tax, has, in effect, determined that the property is not exempt? In the absence of constitutional requirements to the contrary, the power of the legislature to provide for an equitable adjustment of tax burden in such a way as to take into consideration other burdens placed upon a given class of property cannot be disputed. If the legislature deems it appropriate to single out a given class of property and to require that the owners of that property who, as a class, derive most benefit from the proper performance of a given governmental duty, must contribute most to the legitimate cost of its maintenance, and that they may be favored by a corresponding reduction of other burdens, it cannot be said that the property subject to the particular burden is exempt from taxation. The most that can be said is that it is singled out for special treatment and taxed according to a method that is thought to be more appropriate for measuring the relative burden than would be the case if it were taxed according to valuation. There is no particular magic in a name, or even in a legislative designation of a particular form of taxation. Though the legislature may call that which is distinctly a tax by some other name, it nevertheless remains a tax. Where the taxing power of the state is limited by the provisions of the Federal Constitution designed to secure the freedom of commerce between the states, the United States Supreme Court has not hesitated to distinguish between license fees and taxes, and the mere fact that a given charge is imposed by the state as a license charge is not conclusive of the legality of the charge. In the case of Harman v. Chicago, 147 U. S. 396, 37 L. ed. 216, 13 Sup. Ct. Rep. 306, the United States Supreme Court held in effect that a charge imposed as a license fee for the use of the Chicago river was in fact not a fee or toll exacted as compensation for specific improvements, but was in fact a tax upon interstate commerce. As a mere license fee or toll the charge would have been valid. Huse v. Glover, 119 U. S. 543, 30 L. ed. 487, 7 Sup.

Ct. Rep. 313. This proposition is equally applicable to this case,— that which is imposed as a license fee may be in reality both a tax upon the property and a fee. Here it was clearly intended as such.

The prohibition of the exemption of personal property could have been designed for no other purpose than to prevent favoritism and to compel a fairly equitable distribution of the tax burden. A law which secures this end meets every requirement of such a provision though the contribution exacted be not designated as a tax. The distinction between a fee and a tax is one that is not always observed with nicety in judicial decisions (see Seligman, Essay in Taxn. p. 281), but any payment exacted by the state or its municipal subdivisions as a contribution towards the cost of maintaining governmental functions, where the special benefits derived from their performance is merged in the general benefit, is a tax. This is such a charge, and it may properly be regarded as a tax.

We have had the gravest doubt as to the propriety of so construing the law in question; but, viewed in the light of the ample powers of classification given to the legislature, of the known limitation upon the right to exempt personal property, of the declared intention to make the tax in question one in lieu of all other taxes, and of the evident attempt to make the new tax one that should approximately equal both the original tax and the license fee, we are impressed that the law in question imposes both a property tax levied according to a permissible standard and a reasonable license fee. The act consequently does not violate § 176 of the Constitution, concerning exemptions.

Here, too, greater assurance is added to our conclusion by the consideration that the legislature, in the exercise of its power to classify, could largely accomplish indirectly that which is accomplished directly by the act in question. If the legislature should see fit to adopt an act licensing automobiles and make the charge one in addition to a property tax upon vehicles, such as is done in a number of states, it would have the right to base the property tax upon a percentage of valuation that would be so low comparatively as to amount practically to an exemption, and its action in so doing would be justified principally by the fact that a larger burden had been placed upon the property by way of a license charge for its use. Again, we are prone to reiterate the thought that a construction of the Constitution which

would compel the accomplishing of legitimate aims by indirection should be avoided, especially where the true ends of a particular constitutional provision are clear and are met by the legislation in question.

Does the act violate § 174 of the Constitution? In considering this question it must be borne in mind that § 174 was originally adopted as a part of the plan that contemplated the raising of the bulk of the revenues required, both for state and local purposes, from the general property tax levied upon an uniform ad valorem assessment. The limitation was one that could readily be applied to any assessment of the general property of the state that might be made for tax purposes, but it cannot so readily be applied, if the legislature should seek to exercise its powers of classification conferred by the amendment to § 176. Under this plan much of the property might be assessed at a small percentage of its value, and the contemplated basis would be entirely changed. Nor could the section ever have been fully applied under the Constitution as it was originally framed, had the state elected to exercise the power to levy a gross earnings tax upon the railroads in accordance with the express authorization contained in § 176. It was there provided that "the legislative assembly may, by law, provide for the payment of a percentum of gross earnings of railroad companies to be paid in lieu of all state, county, township and school taxes on property exclusively used in and about the prosecution of the business of such companies as common carriers, . . . and whenever and so long as such law providing for the payment of a percentum on earnings shall be in force, that part of § 179 of this article relating to assessment of railroad property shall cease to be in force." It is clear that it was originally contemplated that, in the event the legislature should see fit to adopt a gross earnings tax applicable to railroads, this class of property, which from the beginning has made up a substantial part of the total assessed valuation of the property of the state, should not be assessed at all, and it is equally clear that had this power been exercised it would not have been incumbent upon the state to have distributed the gross earnings taxes to the local governmental units. There would then have been no proper assessed valuation basis upon which to apply the 4-mill limitation of state taxes. So, from the beginning § 174 could not have been regarded as establishing an abso-

lute maximum limitation upon the power of the state to levy taxes. It, of course, applied to that portion of the revenues which might have been derived from property made to contribute according to assessed valuation. State ex rel. Lenhart v. Hanna, 28 N. D. 583, 149 N. W. 573.

When § 176 was so amended as to authorize the classification of property within reasonable limits and to require uniformity only within the territorial limits of the authority levying the tax, it is manifest from what has previously been said in this opinion that the legislature became free to adopt any reasonable measure for determining an equitable basis for contributions to the revenues, and it is equally clear that it was no longer contemplated that there should be an annual assessment of property at its true value. Consequently, the very basis upon which the limitation contained in § 174 was originally intended to apply was no longer fixed by a mandatory requirement of uniform ad valorem assessment. Therefore, whenever the legislature sees fit to adopt some other reasonable basis upon which to determine the amount of tax that may be exacted from an individual than the value of the property owned by him, it does so in pursuance of an authority which is expressly recognized by the Constitution as now amended, and it cannot be said to be exceeding the revenue limitations prescribed in § 174. Section 174 means now very much the same as it has meant from the beginning, viz., that the legislature shall be precluded from raising revenues based upon an ad valorem assessment of property which will exceed in any one year 4 mills on the dollar of the assessed valuation of the taxable property in the state. To construe it otherwise would be not only to ascribe a meaning that would have precluded the proper exercise of the legislative power to tax railroad companies according to gross earnings, under § 176, as it originally stood, but would also prevent the proper use of the authority which it clearly has under § 176 as amended to provide for a separation of sources of state and local revenues, and to exact the same according to any fair method of classification that in its judgment is designed to meet the ends of justice. We are of the opinion that the act in question does not violate § 174 of the Constitution.

Much of the argument of counsel for the petitioner seems based upon the hypothesis that the Constitution precludes taxation of any other

character than a property tax levied upon ad valorem assessment. It is doubtless true that, under the Constitution as it stood prior to the amendment, no other tax upon property than one levied upon an ad valorem assessment at a uniform valuation was contemplated. But, under § 176 as amended, the only requirement is one of uniformity within a class. In some of the states, Georgia, for instance, the Constitution provides not only that taxation shall be uniform upon the various classes of subjects within the territorial limits of the authority levying the tax, but in addition contains the express requirement that property taxation shall be ad valorem. Constitution of Georgia, article 7, § 2. Had it been desired to limit the power of the legislature to prescribe property taxes in such a way as to permit no other kind of tax except one levied upon an ad valorem basis, it would seem that such a limitation would have been expressed in § 176. In the absence of such a provision, it cannot be held that the legislature is precluded from laying a property tax upon any basis that will exact contributions according to an equitable standard and one which is free from the vice of arbitrary classification.

Under the law in question, the amount of the fee or tax is dependent upon the horse power of the motor, which is determined according to a rating established by the National Association of Licensed Automobile Manufacturers. It may be true, as contended, that the rating is defective in that it does not take into consideration the length of the stroke of the piston and the valve equipment, but this is a matter for the legislature to determine; and it is not for the courts to review the reasonableness of the method adopted, in the absence of a showing that it is wholly arbitrary.

The owner of the car is required to make an application for the registration of his motor vehicle, which must contain a description of the car to enable the secretary of state to determine the registration and license fee, according to the prescribed rating. There is not involved in this procedure any act of a quasi judicial nature, such as the placing of a valuation upon property. The tax is determined wholly by the fixed rating, which is dependent upon the size and number of cylinders. The only other factor that enters into the determination of the fee is the length of time the vehicle has been in use as a registered car. Inasmuch as these facts are supplied by the owner, there is no

merit in the objection that the secretary of state is made the assessor of this class of property for the entire state.

The act is further assailed as involving an unconstitutional delega-tion of legislative power upon an administrative or executive officer. This objection appears to be a valid one. In § 4 of the act it is pro-vided: "The secretary of state is hereby authorized to employ such agent or agents as may be necessary to enforce the provisions of this act," and in § 5, the state treasurer, in apportioning the moneys re-ceived to the credit of the counties and to the state highway fund, is required to first deduct from the moneys received "the cost of tags, clerk hire, printing, postage, express and other expenses as estimated by the secretary of state." These provisions clearly involve a delega-tion of legislative power to the secretary of state. There is no limita-tion upon the number of persons he may employ nor upon the salaries he may pay. Neither is there any limitation placed upon the expendi ture that he may authorize for tags, printing, etc. Nor even any limi-tation upon the purposes for which "expenses" may be incurred; the act says "other expenses." Nothing need be said upon this question in addition to what has been said by this court in previous decisions which are clearly applicable to the case at hand. State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724, and State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425. It does not follow, however, that the unconstitutionality of this portion of the law necessarily ren-ders the remainder of the act void.

This identical question was before the supreme court of Illinois in the case of People v. Sargent, 254 Ill. 514–520, 98 N. E. 959; and it was there held both that the provision of the Motor Vehicle Act, which directed the secretary of state to pay into the state treasury the fees received "less the cost of preparing and delivering the registration cer-tificates, registration seals, and number plates," was void because it authorized expenditures without legislative appropriation; and that, though the act was invalid in that respect, the remainder of the Motor Vehicle License Law was not affected. This holding is clearly in ac-cord with the doctrine of partial invalidity as adhered to in this juris-diction (Malin v. Lamoure County, 27 N. D. 140–153, 50 L.R.A. (N.S.) 997, 145 N. W. 582, Ann. Cas. 1916C, 207.), and as expressed

by an eminent authority upon the subject.   (Cooley, Const. Lim. 7th ed. 246).

For the reasons assigned in the foregoing opinion, the writ is denied.

ROBINSON, J. (dissenting).   This case presents no question arising under the Constitution or laws of the United States or of any other state.   Hence, there is no good reason for considering and quoting from all or any of the decisions on the dissimilar laws of other states. This case was brought to compel the assessors of the city of Fargo to list and assess for taxation all automobiles and motor vehicles owned in the city.   It challenges the validity of chapter 56, Laws of 1917. This statute imposes on all motor vehicles a license fee or tax of not less than $6, and for each horse power in excess of 20, there is an additional tax of 50 cents.   Only half the tax is laid on automobiles registered three years prior to the passage of the act.   The same is in lieu of all other taxes, general or local, except that the fee paid by dealers is not in lieu of other taxes.

All taxes are paid to the secretary of state, and he is charged with the supervision and collection of all the taxes.   He pays the same to the state treasurer and from the moneys received in each month, the state treasurer deducts the expense of the business, and the balance he divides into three parts.   One part, or one third of the balance, he distributes to the several county treasurers, and he credits the remainder to the state highway fund.   That fund is all expended and paid out under the direction of the State Highway Commission on vouchers approved by the secretary of the commission, and the money paid to each county is expended for the repairs of highways not within the limits of any city or village.   Such is the theory of the law.   There is no limit to the expense that may be incurred and paid by the Highway Commission and by the secretary of state.   To collect the tax and to enforce the provisions of the act, the secretary of state is authorized to employ such agents and to pay such compensation as he may think proper.   On general expense accounts, there is no limit to his discretion.   Were it not that the secretary is a strictly honest man, he might easily expend among his friends all the receipts of the business and leave not a dollar for the Highway Commission to expend in the same

manner, and so the Highway Commission are given full power to expend as they may please their share of the money.

In 1917 the tax receipts were $210,000, the expense of collecting was $33,700. In 1918 during the first three months, the receipts were $250,000.

To May 15, 1918, the Highway Commission expends—for engineering and drawing, $50,480.87; road work, $335.21.

1. Every law imposing a tax must state the object of the tax to which only it shall be applied. If the object of a tax was the improvement of a highway, the statute should have directed and limited the manner of making the improvement and of collecting and expending the tax. It should not have been all left to the absolute discretion of the secretary and the Highway Commission. There must be some reasonable limitation on the expense of collecting and on the manner of expending a tax, or there can be no assurance of its application to any particular object. State ex rel. Rusk v. Budge Capitol Commission Case, 14 N. D. 532, 105 N. W. 724; State ex rel. Miller v. Taylor (State Bonding Case) 27 N. D. 84, 145 N. W. 425.

2. The legislature must provide for a tax to defray the expense of the state for each year not to exceed 4 mills on the dollar of the assessed valuation of taxable property, and a sum sufficient to pay interest on the state debt. And—with a few exceptions which do not include motor vehicles—all property must be assessed in the county, city, township, village, or district in which it is situated, and the assessment must be made in the manner prescribed by law. § 179.

Certain it is that under the plain words of the Constitution no tax may be levied on motor vehicles without an assessment of the same in the manner provided by law for the assessment of other personal property. Without an assessment of real and personal property according to its value in money, there can be no basis for the levying of a tax on the assessed valuation and for limiting the total to 4 mills on the dollar.

With a few exceptions, including a poll tax, not to exceed $1.50 a year, all taxes must be levied on property according to an assessed valuation to be made and equalized in manner provided by law. And by the guaranties of due process of law the owner of property must have an opportunity to be heard in regard to the assessment of the same

and the levying of a tax against it. The tax which the statute imposes in lieu of all other taxes it names a registration fee or license. Of course that is a palpable misnomer, and it does not in any way evade the limitations of the Constitution. The motor vehicle, like other personal property, must be assessed for taxation in the county, city, township, village, or district in which it is situated, in the manner prescribed by law, and it may not be specifically exempt from taxation. "The legislature may by general law exempt from taxation personal property of each person to an amount not exceeding $200." § 176.

The exemption must be limited to a certain sum or valuation, and not to any particular kind or class of property. It must have a uniform application. Obviously, the statute in question is in direct conflict with the above provisions of the state Constitution, and hence it is void.

## On Rehearing.

BIRDZELL, J. A rehearing was ordered in this case upon two propositions: First, as to whether or not §§ 176 and 179 of the Constitution had been amended in 1914 by the favorable vote of the electors upon the proposition submitted; second, considering the Constitution to have been legally amended, what is the proper meaning of § 174 (the provision limiting the state taxes to 4 mills on the assessed valuation of the taxable property), as applicable to the law in question?

In the concurrent resolution submitting the amendment the legislature referred to the proposed change or changes in the Constitution as "amendments to §§ 176 and 179," and required that "such amendments shall be submitted to the qualified voters of the state at the next general election, for approval or rejection, in accordance with the provision of the Constitution of the state of North Dakota." The amendatory matter has been referred to or set forth at length in the main opinion herein, and need not be reincorporated here. Section 202 of the Constitution outlines the procedure that must be followed in amending the Constitution. The last sentence of the section is, "If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately." It is argued that the amendments to §§ 176 and 179 are separate amendments, and that, not having been so submitted as to enable the electors to vote for or

against each separately, the Constitution has not been legally amended. If this contention is sound it will follow, as a matter of course, that the law in question is unconstitutional; for it is patent that it does not provide for the taxing of automobiles according to their value, thus violating the first requirement of § 176, which, if still a part of the Constitution, requires the taxing by uniform rule of all property according to its true value in money.

Constitutional provisions similar to our own (§ 202) prescribing the requisite formalities to effect an amendment are quite common. In more than half the states there is a requirement of some character which is designed to secure such a submission of constitutional amendments as will enable the electors to vote for or against a single definite proposition. The concurrence of so many constitutional conventions upon the single question of the method of submitting amendments is, in itself, a strong indication of the importance of the question. See Dodd, Revision & Amendment of State Const. p. 179; also, 12 C. J. 690. If the amendment were not properly submitted, it would unquestionably be the duty of the court to declare it not a part of the Constitution. The provisions of our Constitution are mandatory and prohibitory (§ 21), and, as such, the Constitution construes itself in relation to such a matter as that under discussion. State ex rel. Woods v. Tooker, 15 Mont. 8, 25 L.R.A. 560, 37 Pac. 840. Thus, when the Constitution says that "amendments *shall be submitted* . . . in such manner that the electors shall vote for or against each . . . separately," [§ 202] the failure of the proper officials to comply with the direction is necessarily fatal to the attempted amendment. It is the duty of the court to uphold and give effect to every part of the Constitution, and this provision can only be enforced by refusing to recognize as an amendment that which was never legally adopted as such. That this duty has been fully and faithfully discharged by the courts in the past is indicated by the statement of Dodd. After an exhaustive consideration of the experiences of the various states in the submission and adoption of constitutional amendments, he says: "If a required step is omitted, or is not even in substance complied with, no court has ever upheld the amendment, even though it may have been approved by the people. That is, the constitutional requirements are mandatory, not merely directory, and no court will overlook the

entire disregard of even the less important of such requirements."
Dodd, Revision & Amendment of State Const. pp. 217, 218.

As to what constitutes a plurality of amendments within a provision such as our § 202, however, the attitude of the courts generally has been to adopt what is, in our judgment, properly termed a liberal and common-sense view.

The views of the supreme court of Wisconsin, as expressed in the case of State ex rel. Hudd v. Timme, 54 Wis. 318, 11 N. W. 785, are generally regarded as a sound expression of the true meaning of such constitutional provisions. In answer to the contention that an amendment was plural which provided for biennial instead of annual legislative sessions and adjusted the legislative terms and salaries to the new biennial system, the court said: "Such a construction would, we think, be so narrow as to render it practically impossible to amend the Constitution; or, if not practically impossible, it would compel the submission of an amendment (which, although having but one object in view, might consist of considerable detail, . . . though all promotive of the same object and necessary to the perfection and practical usefulness thereof, if adopted as a whole) in such form that a defeat of one of its important matters of detail might destroy the usefulness of all the other provisions when adopted. . . . We think amendments to the Constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon, or connected with, each other." The parentheses above are not quoted, but are inserted to facilitate the reading.

The following expression from the supreme court of Iowa is to the same effect: "If the amendment has but one object and purpose and all else included therein is incidental thereto, and reasonably necessary to effect the object and purpose contemplated, it is not inimical to the charge of containing more than one amendment." Lobaugh v. Cook, 127 Iowa, 181, 102 N. W. 1121.

The supreme court of Montana has expressed the rule in a concise manner as follows: "If in the light of common sense, the propositions

have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment." State ex rel. Hay v. Alderson, 49 Mont. 387, 142 Pac. 210.

This and similar questions have been before the courts of last resort in a number of the states, and, while the decisions are not entirely harmonious, the conflict principally turns upon the application to the particular case of a principle which is quite generally adhered to. See People ex rel. Elder v. Sours, 31 Colo. 369, 102 Am. St. Rep. 34, 74 Pac. 167; People ex rel. Tate v. Prevost, 55 Colo. 199, 134 Pac. 129; Hammond v. Clark, 136 Ga. 313, 38 L.R.A.(N.S.) 77, 71 S. E. 479; Chicago v. Reeves, 220 Ill. 274, 77 N. E. 237; State ex rel. Morris v. Mason, 43· La. Ann. 590, 9 So. 776; State ex rel. Adams v. Herried, 10 S. D. 109, 72 N. W. 93; Gabbert v. Chicago, R. I. & P. R. Co. 171 Mo. 84, 70 S. W. 891; Hubbard v. St. Louis & M. River R. Co. 173 Mo. 249, 72 S. W. 1073; State ex rel. Teague v. Silver Bow County, 34 Mont. 426, 87 Pac. 450; State ex rel. Hay v. Alderson, supra; State ex rel. McClurg v. Powell, 77 Miss. 543, 48 L.R.A. 652, 27 So. 927, overruled in State ex rel. Collins v. Jones, 106 Miss. 522, 64 So. 241; McBee v. Brady, 15 Idaho, 761, 100 Pac. 97; Lobaugh v. Cook, supra; Jones v. McClaughry, 169 Iowa, 281, 151 N. W. 210; Gottstein v. Lister, 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917D, 1008; State ex rel. Hudd v. Timme, supra; State ex rel. Postel v. Marcus, 160 Wis. 354, 152 N. W. 419; State ex rel. Thompson v. Winnett, 78 Neb. 379, 10 L.R.A.(N.S.) 149, 110 N. W. 1113, 15 Ann. Cas. 781; Bethea v. Dillon, 91 S. C. 413, 74 S. E. 983.

To refer in detail to the variety of circumstances in which the question under discussion has arisen in the foregoing cases would unduly lengthen this opinion. We shall consequently content ourselves with a mere statement of the principle which finds practically unanimous support in the many authorities cited.

Such a constitutional provision is designed to prevent the submission to the voters, as one amendment, of distinct propositions that are so far disconnected and independent of each other as to have no direct relation to a general subject. The vice it is designed to prevent is analogous to the log rolling and joker practices which are so familiar

to students of legislation, and which are generally sought to be prevented by constitutional provisions requiring an expression of the subject of legislation in the title of the bill, and that the legislation shall concern but a single subject. It prevents the linking into one proposition of distinct amendments where there might be an attempt to join them together for the purpose of giving unmerited support to an amendment which might be thought to be unpopular, or for the purpose of defeating a popular measure by burdening it with an unpopular one. It compels each distinct amendment to stand upon its own merits, and relieves the voter of the embarrassment that would be occasioned by his being compelled to vote against a measure he deems desirable, in order to defeat one that he does not favor; or, if he should deem it the lesser evil, to vote for the proposition he favors and at the same time cast his vote in favor of an amendment that is distasteful to him. Reference to the cases cited above will disclose that the courts have differed little, even in the expression of the principles according to which the constitutional provision is enforced. But it will also disclose that, to the extent that there is a lack of harmony in the results arrived at, it is due to differences of opinion as to their application.

A somewhat extreme application of the foregoing principle is found in the case of People ex rel. Elder v. Sours, supra, in which the supreme court of Colorado held that an amendment was single where it provided for the consolidation of the city of Denver and the county of Arapahoe and for the framing of a charter by the new municipal corporation; also, for the framing of home rule charters by all cities of the first and second classes within the state. See Dodd, Revision & Amendment of State Const. p. 180.

The amendatory matter in the instant case relates to the uniformity of taxation, permits the classification of property, and alters the section regulating the assessment and taxation of certain public utility properties. Within the principle stated above and under the authorities cited, there can be no question that a change may be effected by one amendment which would materially alter more than one section of the Constitution. Nor can there be any doubt that this can be accomplished either by implication or by express language. It is also clear that § 202 of the Constitution is not violated where an amendment which is in reality single is expressed in several sections which

are all submitted as one proposition. In fact, the limitation applies only to the substance of the amendment, and not to its form. So, in this case our inquiry is narrowed to this,—Is the whole of the matter so germane to the general subject of the amendment as to have a direct bearing upon the object sought to be accomplished, and is it so closely related to the general subject that it may be considered as within its legitimate scope? If so, it is sufficiently connected with a single subject-matter to be properly embraced within one amendment.

In the original opinion a brief survey was made of various sections of the Constitution embracing limitations upon the taxing power, and it was seen that, at the basis of all of them, lay the mandatory requirement of § 176, that property should be taxed uniformly and according to value. It was also pointed out that for these limitations there was an apparent desire to substitute a provision that would enable the legislature to classify property with reference to its use, its value, its utility, and, in general, its setting in the economic organization of society with reference to the functions of government as exercised by the state and its minor subdivisions. These purposes differ so radically from the purposes evidenced by the original section that the amendment would naturally carry with it, if accomplished, and if legislation were adopted in pursuance of the powers intended to be given, changes in the scheme of public finance that were not in the contemplation of the framers of the original Constitution. These changes were intended to be effective to the extent that legislation within the limitations of § 176, as altered, departs from the requirement of full value ad valorem assessment as originally contemplated. For instance, the sections of article 12, which prescribe limitations upon the debts of various municipalities, take, as a basis, a percentage of the assessed valuation of the taxable property. Those limitations are doubtless still applicable, but the legislature may now give express sanction to assessments at a percentage of value, and executive and administrative officers may no longer be required to perpetuate a legal fiction of sworn full valuation in the face of contrary facts and a quarter-century's universally known administrative practices. In fact, many of the provisions of the Constitution relating to revenue and taxation were framed to fit a system that had no actual existence. It was a mere phantom that had never taken up its abode in the world of things,

prior to the adoption of the Constitution; nor did the hard and fast requirements of the Constitution prove efficacious to convert it into a reality. Under the amendments it may possibly be that there will be a closer proximity between express requirement and limitation and actual practice. To the extent, however, that the original plan stands in the way of attempts to carry out the powers conferred by the amendment, it is, of course, superseded.

The limitations of the original Constitution only acquired vitality as applied to the actual administration of the tax laws; and it is a fact so well known generally as to be properly within our judicial notice that property assessments have never approached full value in this state, and that probably more taxable personal property has been omitted from the tax rolls than has been assessed. It may be that under the amendment in question, laws might be passed under which the aggregate assessed valuation would be radically increased. If so, the tax-levying and debt-limiting provisions of the Constitution might operate quite differently from the way they have in the past, or even from the way it was originally contemplated they would operate. This is but incidental to the change.

It is argued that a law which measures a tax by some characteristic of property, other than its value, destroys the basis of such limitations as those referred to. If this be so, the argument proves nothing, provided the original limitations are still applicable. If still applicable, as we believe they are, they will necessarily preclude the legislature from taxing a great amount of property according to such a method as is employed in the instant case; as, under our construction of the law, it operates to reduce, rather than increase, the power to incur debts. While thus preventing extravagance, the legitimate needs of the local municipalities, which can only be supplied by a proper exercise of their borrowing power, will necessitate the continuance of the practice of taxing the bulk of the property on an ad valorem basis.

As stated in the original opinion, there is an inherent inconsistency between a constitutional provision that requires the taxing according to a uniform valuation and rate of all property lying within a given taxing district and a constitutional provision that requires uniformity only within a class and within the territorial limits of the authority levying the tax. The inconsistency lies in the entire absence of any

semblance of permissive local option in the one case which is present in the other. Thus, under legislative authority, cities may levy at their option, taxes for their own support in accordance with a classification of property that may be deemed appropriate for such purposes. Such a classification might not be adopted by other cities or even applicable to other municipalities at all. So long as the city taxes are uniform within a given city upon the same class of property, and the classification of the property upon which the tax is levied be one that does not violate the state or Federal Constitutions in other respects, the law which would authorize it would provide for a tax that would be uniform upon the same class of property "within the territorial limits of the authority levying the tax," and would be valid within § 176 as amended. The limitation just quoted is the requirement of uniformity. It requires uniformity within a class and within the territorial limits of the particular taxing authority. If it were still intended to require that all property within a tax district be subject to every levy of every municipal and quasi municipal corporation having jurisdiction to tax it, the rate would be uniform by virtue of the enforced localization of the property, and the words last quoted above would be surplusage. In interpreting the Constitution it is well settled that it should not be assumed that words have been used to no purpose. It seems clear to us that it was the aim of § 176 to make such provision for the classification of property for taxing purposes that the state taxes should be uniform throughout the state, county taxes throughout the county, city taxes throughout the city, school taxes throughout the district, et cetera; and, moreover, that each of such taxes should be levied alike upon the same classes of property, but that all need not be levied upon the same basic classification. Nothing could be plainer, we believe, than that by § 176 it was intended to provide that the legislature in its discretion might authorize a separation of the sources of state and local revenues, which can be accomplished only by subjecting some property to taxes for purposes to which all property does not contribute. This follows necessarily from a limitation that requires uniformity within a class only throughout the boundaries of the taxing authority.

If we have correctly sensed the meaning of § 176, it remains to be seen whether its scope is so broad as to embrace subjects so far unrelat-

ed as to require separate submission; for, as will be noted later, the changes made in § 179 are only such as affect the subject-matter clearly embraced in § 176. The general subject of the amendment is uniformity, but situs is also dealt with. May situs be so essentially a part of a particular plan of uniformity as to be embraced in the general subject? The subject of uniformity is broad in its scope and suggests a variety of means for effecting the desired end. Our ideas as to what constitutes uniformity in the abstract will likely be as variant as our opinions concerning the economic phases and incidents of taxation. But it is not our province to seek to ingraft any particular economic dogma into the Constitution. We are properly confined to the narrow question as to whether uniformity may embrace the element of situs. It seems clear to us that it may and does do so. It is one thing to require uniformity throughout the state, another throughout the district. It is one thing to require uniformity as to all property, another as to classes. It is one thing to require uniformity within a class in every taxing district and quite another thing to permit classification for the purposes of a particular taxing authority. It would indeed be a difficult matter to dissociate uniformity and situs for the reason that there must be a common location of property before it could be determined that one species has been unfairly dealt with. The relationship between situs and uniformity, then, is one which, in our opinion, is not remote or artificial, but direct and natural. It was therefore appropriate to link the two to effect the single purpose of substituting a different rule of uniformity in lieu of the one that had hitherto prevailed.

As pointed out in the former opinion, the change that was made in § 179, according to which it was no longer required that the assessed valuation of the public utilities properties be distributed to the local taxing units, was only such change as was necessitated by the evident desire to give effect to the full scope of § 176 and make possible the separation of sources of revenue for the support of the state and its subdivisions.

It should be noted, too, that § 179 as amended, no longer requires the state board of equalization to assess the public utilities properties "at their actual value," as formerly. This change was also doubtless dictated by the desire to render § 179 harmonious with § 176, so that

in any classification that would be attempted it would not be necessary for the legislature to make it conform to an assessment of public utilities properties at 100 per cent of their value. These changes were so essentially a part of the general purpose of § 176 as amended, that they might appropriately have been included in one section, and the fact of their being expressed in two sections renders them none the less connected with the general subject of uniformity of taxation, which is clearly the aim of the amendment. We are entirely convinced that all of the changes sought to be effected by the amendatory matter are so logically and directly connected with one general subject that none of them can be said to relate to a separate and independent subject.

It is argued that there might be many persons who would favor giving the legislature power to classify property for tax purposes, and require that the taxes should be uniform within the territorial limits of the authority levying the tax, who would be unwilling to relinquish, at the will of the legislature, the assessed valuation of the public utility properties as they are apportioned to the various taxing districts by force of § 179. Perhaps this might be true, but amendments to the Constitution are not to be analyzed until each idea that enters into a composite thought or purpose is made to stand out dissevered from every other idea with which it is related. There may be a distasteful clause or a possibly disagreeable minor result attributable directly to an amendment, but yet the amendment must not fail because it might have been possible to couch it in a little different language, or to have defined its scope in such terms as to have eliminated the disagreeable consequence. This is not the test of the singleness of an amendment. The controlling consideration is the singleness of the purpose and the relationship to the general subject.

We are entirely satisfied that the amendment in question was legally adopted and is a part of the Constitution.

We think it proper to note in this connection, though the incident has no force as a legal precedent, that the second article of the amendments to the Constitution, which was adopted in 1898, amended two sections (§§ 121 and 127) relating to the elective franchise. Section 121 was amended by striking from it the provision including in the electorate of the state persons of foreign birth, who had declared their

intention of becoming citizens; and § 127 was amended by adding thereto the requirement that the legislature shall by law establish an ' educational test as a qualification, and that it might further prescribe penalties for neglecting or refusing to vote at a general election. The amendments to these sections were framed in two sections and were adopted as one amendment to the Constitution in the election of 1898, being voted upon as a single proposition. Yet, there are many reasons why intelligent alien declarants should be allowed to vote, if they can meet the educational test prescribed for citizens. In the present war the government of the United States has held them subject to involuntary military duty. Doubtless there could be found many persons who would vote against depriving such persons of the franchise, who would also vote in favor of a general educational qualification. Yet, it is clear that the amendment related to but a single subject and embraced appropriate safeguards of the elective franchise. Similarly, in our sister state of Minnesota, in 1906, an amendment which is almost identical with § 176 of our Constitution as amended was adopted as a single amendment and took the place of five distinct sections in the Constitution of Minnesota as it originally stood; and though the statutes of Minnesota disclose that much legislation has been adopted in pursuance of the amendment, which would have been constitutionally impossible under the sections superseded, and though Minnesota has a constitutional provision similar to our § 202, our researches have failed to disclose that the validity of the amendment has ever been assailed on the ground of multiplicity of subjects.

As to the meaning of § 174 since the amendment of the Constitution and as applicable to the law in question, nothing need be said in addition to what was said in the original opinion. The rehearing has served to give added assurance of the correctness of the result arrived at, and the order denying the writ is confirmed.

GRACE, J. I concur in confirming the order denying the writ.

ROBINSON, J. (dissenting). The purpose of this suit is to secure the assessment and taxation of motor vehicles in the same manner as other property. In 1917 the legislature passed an act to create a highway commission (chap. 131), and an act imposing on motor vehi-

cles a specific license tax in lieu of all other taxes (chap. 156). By the first act a highway commission is created, with power to construct and improve highways. By the second act, *in lieu of all other taxes,* there is levied on motor vehicles a license tax of $6 on the first 20-horse power, and 50 cents for each additional horse power. The secretary of state is authorized to employ agents and to pay all expenses of collecting the tax. But after making such payments, the balance of the money, if any, is divided into three parts,—one part is apportioned to the several counties, and the rest is put to the credit of the highway commission "to be paid by the state treasurer upon vouchers approved by the secretary of the Commission." Under the statute the money allotted to the Highway Commission is virtually thrown into its lap. It is given the key to the treasury and the right to expend, as it did from March, 1917, to May 15, 1918:

For drawings ....................................$50,480.00
For road work ...........................$    335.21

For the years 1917 and '18 the motor tax is $722,753.

Those facts are subject to many grave and serious objections. Indeed, they are in direct conflict with several sections of the Constitution and the fundamental principles of law governing taxation. Under the Constitution no act may embrace more than one subject, which must be expressed in its title. § 61. And yet the title to chapter 131 does manifestly embrace several subjects: The title is an act (1) to create a highway commission; (2) to fix the salary of the state engineers; (3) to provide for disposing of fines and penalties; (4) to assent to an act of Congress; (5) to provide state aid in the construction and repairs of roads and bridges; (6) to amend and repel half a dozen sections of the compiled laws. Such a title speaks for itself, and shows beyond question that the act is void and hence in law there is no highway commission.

Now for each year the state tax levy must not exceed 4 mills on the dollar of the assessed valuation of all taxable property, and a sum sufficient to pay interest on the state debt. § 174. But how can that limitation have any force or effect if taxes may be levied on motor vehicles or on other property without any assessment; and if one kind or class of property may be subjected to a tax levy without an assessment, what is there to prevent a similar levy on all kinds or classes

40 N. D.—22.

of property? If we may levy on motor vehicles a specific tax of from $6 to $60, what is there to prevent a similar levy on every other kind of property? And if we may levy a tax on city property to make country roads, or to fill the pockets of a commission, why may we not levy a tax on country property to pave city streets? Why may we not levy a tax on one class of people to benefit or enrich another class?

Furthermore, no tax may be levied except in pursuance of law, and every law imposing a tax must state distinctly the object of the same, to which only it shall be applied. § 175. Yet the law imposing a motor vehicle tax to an amount sufficient to pay nearly all the neces· sary expenses of the state does not state how it shall be applied. Its application is left mainly to the discretion of the secretary of state and the highway commission. Under the statute the bulk of the money should go to a commission that is left entirely free to expend it when and where and as they may please. The only limitation is that 90 per cent shall be spent in the several counties in proportion to the amount collected therein. "Ten per cent of the fund shall be spent according to the discretion of the commission," and "none of the money shall be expended within the limits of any incorporated city or village." The money is to be paid on vouchers approved by the secretary of the Commission; though the Constitution provides no money shall be paid out of the state treasury except upon appropri- ations made by law, and on a warrant drawn by the proper officer,— the state auditor. § 186.

Of course, the statute does contemplate that the bulk of the tax shall be used for the construction or improvement of country high- ways, but the people have not by a two-thirds vote authorized the use of the money in that way, and under the Constitution the state may not engage in any work of public improvement unless authorized by a two-thirds vote of the people. § 185.

Moreover, all individual property must be taxed by uniform rule, according to its value in money, and there may be no exemption of personal property in excess of $200 for each individual. § 176. And all property must be assessed in the county, city, town, village, or dis- trict in which it is situated, in manner prescribed by law, except rail- roads and other public utilities, which are assessed by the state board of equalization. § 179.

By vote of the people in 1914 the first sentence of § 176 was amended to read thus: *"Taxes shall be uniform upon the same class of property, including franchises within the territorial limits of the authority levying the tax."* Under this innocent amendment, of course, the legislature may classify property for the purposes of taxation, but it may not dispense with an assessment. The amendment does fairly contemplate a classification of property for assessment and taxation purposes, and under it an act was passed dividing all property into three classes: (1) The real estate class—to be assessed at 30 per cent of its value; the personal property class, at 20 per cent; the nonproductive class of household property, at 5 per cent. Laws 1917, chap. 59. Motor vehicles are in the second class, and they must be assessed at 20 per cent of their true and full value, and they may not be exempt from taxation. Under said last and latest amendment, approved in 1914, every motor vehicle, like other personal property, must be assessed in the county, city, township, village, or district in which it is situated, and in the manner prescribed by law. § 179. When the assessments are made, then taxes may be levied in pursuance of law by the state and by the several municipalities. Aside from the small sum necessary to pay interest on the public debt, the state may levy no tax in any one year in excess of 4 mills on the dollar of the assessed valuation of all the taxable property. § 174. It may not levy taxes for counties, cities, or other municipalities or take the control of their affairs; because their existence and rights are imbedded in, and guaranteed by, the Constitution. True, the state may, by general law, provide for the organization of municipal corporations and restrict their power to levy taxes and assessments and to borrow money and contract debts. § 130. But that is not a power to destroy the municipalities, to manage their affairs, or to levy and disburse their taxes; and most assuredly it is not a power to levy taxes on one municipality or locality for the special benefit of another.

In the majority opinion it is said of those limitations of the Constitution: "If still applicable, as we believe they are, they will necessarily preclude the legislature from taxing a great amount of property according to such a method as is employed in the instant case." This is an admission that the tax is illegal and void, with a hope that the legislature may not do it again to any great extent. For if this method

of taxation may not be applied to all other property, it must be in con-
flict with the uniform method of the Constitution. Indeed, it is in no
way possible to sustain the motor vehicle tax by a single point of law
or logic. For under the plain words of the Constitution there can be
no tax without an assessment.

Finally, if the state may levy a specific tax on motor vehicles or on
one class of property, "to be in lieu of all other taxes, general or
special," then it may in like manner levy a similar tax on any other
class of property, and in that way deny to every municipality the pow-
er to levy any tax. It may virtually destroy every municipality by
depriving it of any resources, collecting all its taxes and giving the
same to a Commission to be used according to its discretion, *but not
in any city or village*. As the argument shows, the specific motor vehi-
cle tax, which the statute imposes without any assessment, is in direct
conflict with all the fundamental principles of taxation, as guaranteed
by the Constitution. Hence, the tax and the statute are illegal and
void. That is all as clear and as certain as it is that twice two is four.