# Hatcher, Secretary of State, et al. v. Meredith, Atty. Gen.

June 15, 1943.

As Modified on Denial of Rehearing

July 15, 1943.

WINN and BRADLEY, Special Judges, dissenting.

G. L. Tucker for appellants.

Hubert Meredith for appellee.

Before LAFON ALLEN, Special Chief Justice, and ROY SHEL-
BOURNE, ALLEN P. CUBBAGE, B. J. BETHURUM, VICTOR BRAD-
LEY, ROBERT H. WINN, and I. B. ROSS, Special Associate Judges.

OPINION OF THE COURT BY SPECIAL JUDGE CUBBAGE—
Reversing.

The General Assembly, at its regular 1942 session,
passed an act, which is Chapter 171 of the Acts of 1942,
submitting to the electorate a proposed amendment to
the Constitution of Kentucky, to repeal Section 246
thereof and to substitute provisions which materially
alter that section. On February 3, 1943, Honorable Hu-
bert Meredith, as Attorney General, filed this action
wherein said Act is assailed as being in conflict with sev-
eral sections of the Constitution, and seeking a declara-
tion of rights. The court was first called upon to deter-
mine whether the Act in question was constitutional,
and, if the question of the constitutionality was deter-
mined adversely to the contentions of appellee (plaintiff
below), then he prayed that the court adjudge whether
the question to be submitted to the voters was to be
stated on the ballot as set forth in the Act, or in the man-
ner provided by Kentucky Revised Statutes, Section
118.430, which directs that the Attorney General shall
formulate the question to be stated on the ballot, in a
manner calculated to inform the voters of the substance
of the proposed amendment in order that they may

understandingly decide whether they favor or oppose the suggested change.

A general demurrer was filed to the petition, and the trial court overruled the demurrer. Appellants (defendants below) stood upon their demurrer and declined to plead further. Thus the parties pitched the case upon the determination of the legal questions aforesaid, and apparently there is no issue as to facts. Judgment was entered declaring the said Act unconstitutional and void, and ordering appellants not to advertise the amendment or cause it to be placed upon the ballot for the vote of the people, and from said judgment appellants have prosecuted this appeal.

We are first confronted with the issue as to whether the Act which seeks to submit the proposed amendment is offensive to Section 51 of the Constitution. The title to this act is as follows: "An Act to amend Section 246 of the Constitution of the Commonwealth of Kentucky relating to compensation for official services," and the position taken by appellee is that it is too limited in its scope and is not sufficiently broad to give notice of the full import of the provisions contained in the body of the Act. The right to propose a constitutional amendment has been granted to the Legislature by the framers of the Constitution, but the exercise of this right is not legislative in the ordinary sense, and indeed the Legislature is denied the privilege of amending the Constitution. That is a matter which can be determined only by the direct vote of the people as a whole. While the authority of the Legislature to suggest amendments to the Constitution is plenary, yet it differs widely from the function of the General Assembly to enact laws. The power to submit amendments to the vote of the electorate is special in its nature and may be exercised either by a bill, order, resolution or vote, as is provided by Section 256 of the Constitution, and, so far as the title is concerned, the passage of the bill would have been just as valid without any title at all, and an order or resolution would have served the same purpose. So far as we are advised this particular question has not previously been before the court of last resort in this State, but the decided weight of outside authority supports the views which we have herein expressed. The cases of Cooney v. Foote, 142 Ga. 647, 83 S. E. 537, Ann. Cas. 1916B, 1001, and Johnson v. Craft, 205 Ala. 386, 87 So. 375, are typical of the numer-

ous decisions. Apart from this, our Kentucky Court of Appeals has consistently held that if the title to an act sets out the number of the section to be amended, it sufficiently accords with Section 51 of the Constitution which requires the purposes of the act to be expressed in the title. Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, 166 S. W. 1017; Morrison v. Com., 197 Ky. 107, 246 S. W. 128; Guess v. Linton, 236 Ky. 87, 32 S. W. (2d) 718; Frost v. Johnston, 262 Ky. 592, 90 S. W. (2d) 1045; and Muffett v. Black, 263 Ky. 199, 92 S. W. (2d) 74.

The two outstanding changes which would result from the amendment of Section 246 would be (1) to remove the present salary limitation as to public officials and permit the General Assembly to regulate the compensation of such officials and employees, and (2) to provide that such regulation shall affect the compensation of those in office, or elected to office, at the time of the adoption of the amendment, but thereafter the compensation of such officials shall not be increased or decreased during the terms for which they are elected or appointed. Sections 235 and 161 of the Constitution provide that the compensation of public officials shall not be changed during the terms for which they were elected or appointed. Complaint is made that two amendments are coupled together in one submission, and that they relate to different subjects in violation of Sections 256 and 51 of the Constitution each of which sets forth a limitation that no amendment shall relate to more than one subject. If this contention is sound, the proposal would be in violation of the Constitution.

Thus our inquiry narrows to the question of whether the whole matter found in the amendment is so related to the general subject of the amendment as to have a natural connection with it, or is so foreign to it as to have no bearing upon the general subject matter and the object sought to be accomplished. Constitutional limitations such as the one now under consideration are intended to prevent the submission, as one amendment, of two or more propositions which are so widely separated in meaning and purpose as to have no logical interdependence. A single question on such a double proposal cannot be truthfully answered, ''Yes'' or ''No,'' by a voter who favors one proposal, while opposing the other. He cannot vote at all without supporting what he desires to

oppose or opposing what he desires to support. In this manner, the fate of one proposal might turn, not upon its own merits, but upon the popularity or unpopularity of the unrelated proposal with which it was linked. Such a proposal would relate to more than one subject and would violate Section 256 of the Constitution. If, however, each provision of a proposed amendment is an integral part of a general plan, the amendment is not plural. It seems clear to us that there is but one subject contained in the proposed amendment of Section 246 of the Constitution. The first proposition is that the General Assembly shall regulate the compensation of public officials and employees, and the second proposition is that such regulation of compensation shall apply to those in office, or who have been elected to office, at the time of the adoption of the amendment. There is no subject embraced in the proposal other than the regulation of the compensation of public officials and employees. The changes sought to be made are so logically and directly connected that none of them is independent, or foreign to the one subject of official compensation. A comparatively recent case before the Court of Appeals was that of Burke v. Department of Revenue, 293 Ky. 281, 168 S. W. (2d) 997, wherein an act was involved, the title of which was this: "An Act relating to revenue and taxation." In the body of the act the qualifications of tax commissioner were defined. It was contended that more than one subject was embraced, but it was held that the qualifications of a tax commissioner have a direct relationship to revenue and taxation, and that there was a single subject. In the case of City of Ravenna v. Boyer Fire Apparatus Co., 218 Ky. 429, 291 S. W. 782, 784, an attack was made upon the constitutionality of an act entitled: "An Act relating to cities of sixth class." There was a provision in it for the purchase of fire apparatus, and it was argued that this was not germane to the subject, but it was decided that only one subject was involved. See also Eastern Kentucky Coal Lands Corp. v. Commonwealth, 127 Ky. 667, 106 S. W. 260, 108 S. W. 1138.

Even though it may be said that the effect of the amendment will be to suspend, temporarily, Sections 235 and 161 of the Constitution, this does not mean that more than one subject is embraced. The fact that an amendment impliedly repeals sections not mentioned therein does not thereby render it unconstitutional. Ex parte

City of Paducah, 125 Ky. 510, 101 S. W. 898; Edrington v. Payne, 225 Ky. 86, 7 S. W. (2d) 827; Barnett v. Caldwell, 231 Ky. 514, 21 S. W. (2d) 838. A very pointed declaration upon this subject is found in Mitchell v. Knox County Fiscal Court, 165 Ky. 543, 177 S. W. 279, 282, wherein it was held that an amendment to the Constitution impliedly modifies any existing section thereof with which it is in conflict. The court said:

"Section 157a, being an amendment to the Constitution, necessarily annuls any and all former provisions of that instrument which conflict with it; and, since it permits the state to give its aid to the building of county roads, it cannot be said to violate Section 177, which was intended to be changed in this respect."

Appellee calls to our attention the passage by the General Assembly at the same 1942 session, of another act submitting another amendment to the Constitution providing for a compulsory system of workmen's compensation, to be voted upon at the same election as the one here in question. One of the many provisions of Section 256 of the Constitution is that not more than two amendments shall be voted upon at any one time. It is said by appellee that the public official compensation amendment is in reality two or more amendments, and that the workmen's compensation amendment runs the whole number beyond two which is the limit which can be submitted at any election. However, our conclusion already expressed that Section 246 covers only one subject disposes of this question.

It is further provided by Section 256 of the Constitution that amendments thereto shall be so submitted as to allow a separate vote upon each. It is forcefully insisted that the proposed amendment to Section 246 does not allow to a voter a separate vote as to whether the salary limitation, which is now a part of Section 246, shall be removed, and a separate vote on the other proposition as to whether it shall apply to officials in office or elected at the time of the adoption. The argument is plausible, and somewhat persuasive, but it does not accord with the law. Numerous States have constitutional provisions very much like ours with reference to submission of amendments so as to allow a separate vote upon each. For example the constitution of North Dakota, Section 202, as amended, has this provision:

"If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately";

and, in State ex rel. Fargo v. Wentz, 40 D. N. 299, 168 N. W. 835, 5 A. L. R. 731, the Supreme Court of that State decided that two or more propositions may be embodied in one amendment, without submission to separate vote, if the propositions all relate to one general and natural subject. This view, generally regarded as sound, has been well expressed by the highest court of Wisconsin in the case of State ex rel. Hudd v. Timme, 54 Wis. 318, 11 N. W. 785, 791, in language as follows:

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view."

Neither is this a new question in Kentucky. The case of Curry v. Laffoon, 261 Ky. 575, 88 S. W. (2d) 307, 308, is like the instant case in principle. Before the days of State prohibition of the sale of intoxicating liquors, Section 61 of the Constitution provided for local option regulation of the liquor traffic. Section 226a, the prohibition amendment to the Constitution, was adopted by the people, and later the Court of Appeals held that Section 226a being inconsistent with Section 61, the latter section was thereby repealed. Still later the General Assembly passed an act proposing the repeal of Section 226a and the re-enactment of Section 61. In the Curry case, supra, it was urged, as in this case, that as the two propositions were submitted in one amendment, the amendment was in conflict with that portion of Section 256 of the Constitution providing that amendments must be so submitted as to allow a separate vote upon each, but it was held that the section embraced but a single subject, that of regulation of the liquor traffic, and was not in violation of Section 256 of the Constitution. In the course of the opinion the court said:

"The fact that the question submitted was more narrow than it might have been refutes, rather than sustains, appellant's argument that the question submitted was duplicitous."

It was further pointed out in that case that the General Assembly in proposing an amendment may attach a con-

dition to it. In so holding, the following language was employed:

"The fact that the Legislature saw fit to condition the repeal of Section 226a upon the re-enactment of Section 61 merely presented a single subject in a more narrow form."

In the same case the court quoted with approval from the case of State v. Alderson, 49 Mont. 387, 142 P. 210, Ann. Cas. 1916B, 39, to the effect that if the proposals may be logically viewed as parts of a single plan, the constitutional requirement is met in their submission as one amendment. In the case before us for determination, the voters will be called upon to decide at the polls whether they favor the proposed amendment of Section 246 of the Constitution on condition that it shall apply to those who are in office or who have been elected at the time of its adoption. The condition is a closely related part of a single plan.

It is further insisted that the amendment will violate Section 6 of the Constitution that elections shall be free and equal. We find no merit in this position. We see nothing in connection with the proposed amendment which will obstruct any voter from freely and equally exercising the elective franchise. This section has been construed to mean that the voter shall not be physically restrained in his right to vote. Robertson v. Hopkins County, 247 Ky. 129, 56 S. W. (2d) 700.

Moreover the conclusions which we have reached find support in numerous decisions that courts should be reluctant to declare legislative acts unconstitutional, and will resolve doubts in favor of their validity and will sustain such acts unless clearly in conflict with constitutional limitations. Commonwealth v. Hodges, 137 Ky. 233, 125 S. W. 689; Fiscal Court of Pendleton County v. Pendleton County Board of Education, 240 Ky. 589, 42 S. W. (2d) 885; Stevenson v. Hardin, 238 Ky. 600, 38 S. W. (2d) 462; Commonwealth Life Ins. Co. v. City of Paducah, 244 Ky. 756, 52 S. W. (2d) 704; Jefferson County ex rel. Grauman v. Jefferson County Fiscal Court, 273 Ky. 674, 117 S. W. (2d) 918; Burton v. Mayer, 274 Ky. 245, 118 S. W. (2d) 161; and Martin v. Gage, 281 Ky. 95, 134 S. W. (2d) 966, 126 A. L. R. 449.

It has been suggested that the proposed amendment of the Constitution deals with more than one subject be-

cause it not only repeals Section 246 of the Constitution, imposing a "ceiling" on the compensation of all "public officers" (except the Governor), but also limits or destroys the right of local self-government of municipal corporations with respect to their "private" affairs as distinguished from their "public" or "governmental" functions. In McDonald v. City of Louisville, 113 Ky. 425, 68 S. W. 413, and in City of Lexington v. Thompson, 113 Ky. 540, 68 S. W. 477, 57 L. R. A. 775, 101 Am. St. Rep. 361, the doctrine that such corporations are free from legislative control of their private affairs was announced and has been adhered to in many recent cases, vide Campbell v. Board of Trustees, 235 Ky. 383, 31 S. W. (2d) 620; Board of Aldermen v. Hunt, 284 Ky. 720, 145 S. W. (2d) 814.

While in some of these cases it was sometimes said that "the state" cannot take away this right of local self-government, all of the cases actually involved only legislative interference and we have found no case in which it was held that the right might not be taken away or restricted by constitutional provisions.

But that is not the question we have. Our question is whether or not a constitutional amendment, which removes the present "ceiling" on compensation for public service and confers upon the General Assembly the power to regulate such compensation, deals with more than one subject because, if adopted, the power thus conferred upon the General Assembly might be exercised in a manner which would interfere with the exclusive power heretofore vested in municipal corporations to fix the compensation of officeholders in charge of their private or nongovernmental affairs.

Section 246 of the Constitution fixes the maximum compensation payable to "public officers." The proposed amendment removes that "ceiling" and grants to the General Assembly the power to "regulate compensation of public officials and employees." The Court of Appeals has held in Talbott v. Public Service Commission, 291 Ky. 109, 163 S. W. (2d) 33, that Section 246 of the Constitution embraces public "employees" as well as public officials. If the proposed amendment is sufficiently broad to permit the Legislature to regulate the compensation of local public employees (a question which we are not called upon to decide) it remains the

one subject of compensation of public officials or employees.

It may be said that the Act proposing the amendment is obscure, or that it would not be wise to adopt it, but these are questions in the first instance for the General Assembly and in the latter instance for the people. The right of the people to decide whether or not the Constitution shall be amended as proposed cannot be denied because of a fear that they will not make a wise decision. The court cannot be governed by a foreboding as to the consequences of the adoption of the amendment. In any event, past experience hardly justifies such apprehensions. The host of public servants, state and local, who have served and are now serving for compensation less than $5,000 annually, despite the importance of the duties imposed upon many of them, seems to indicate a disposition to parsimony rather than extravagance.

We live under a democratic form of government. We choose to do so, not because it invariably serves the immediate interest of man better than other systems, but because it is more congenial to his spirit—that spirit of independence and self-reliance which gives dignity to his life. For the sake of this, we forego the temporary advantages which may attend a more absolute or centralized form of government. Having made this choice, we must bear with its consequences. The people of Kentucky have the right to amend its constitution as they please and, if mistakes are made, we must patiently await the time when experience will lead to their correction.

Since it is our view that the trial court erred in holding that the proposed amendment is unconstitutional, and as we are holding that it is proper for the suggested amendment to be submitted to the vote of the people, we are brought to the issue whether the question to be stated on the ballot shall be in the form prescribed by Section 4 of Chapter 171 of the Acts of 1942, or in the form of a question to be composed by the Attorney General clearly stating the substance of the amendment. The authority granted to the General Assembly in connection with amendments to the Constitution is to propose them to the voters. As we have stated, this is a special power which is not legislative in character. The General Assembly by the enactment of Section 118.430, Kentucky Revised Statutes (formerly Section 1459 of Baldwins'

Revised Statutes, 1936 Edition), has by general law provided the machinery by which all proposals to amend the Constitution shall be certified to the officials charged with the responsibility of placing the proposal on the ballot. As that general law existed at the time of the adoption of the proposal here in question, the duty devolved upon the Attorney General to prepare and certify to the Secretary of State the question to appear upon the ballot.

Without any expressed purpose either in the title or body of the act proposing the amendment to repeal or modify Section 118.430, Kentucky Revised Statutes, the General Assembly has by Subsection 4 of the proposed amendment ignored its general law enjoining upon the Attorney General the duty of preparing and certifying the question to the Secretary of State. By Subsection 3 of the Act, the General Assembly invoked the machinery of its general act, which in Subsection 4 it ignored. Subsection 4 of the Act is therefore void.

As to the required publication of a proposed amendment for not less than ninety days preceding the election, Section 118.430, KRS, attempts to impose this duty upon the Governor, the Attorney General and the Secretary of State, but by Section 257 of the Constitution this duty is imposed upon the Secretary of State alone. The provision of the Constitution should therefore prevail.

Judgment reversed and cause remanded with directions for further proceedings consistent with this opinion.

Whole Court sitting.

Chief Justice Allen, and Special Judges Shelbourne, Ross, and Bethurum, concurring.

I regret that I am unable to concur in the majority opinion, for the reasons now set out.

The General Assembly of 1942 enacted, or agreed to, a plan for the amendment of the Constitution of Kentucky. Its action is set out now totidem verbis:

"Be it enacted by the General Assembly of the Commonwealth of Kentucky:

"Section 1. That Section 246 of the Constitution of Kentucky be and the same hereby is amended by repealing said section in its entirety and enacting in lieu thereof the following.

"Section 2. The General Assembly, as soon as practicable after the enactment of this amendment, shall regulate compensation of public officials and employees, including those in office and those elected to office at the time of adoption of this amendment; and provide for penalties and what deductions shall be made for neglect of official duties. Thereafter, the compensation of public officials shall not be increased or decreased during the terms for which they are elected or appointed.

"Section 3. This amendment shall be submitted to the voters of the State for their ratification or rejection at the time and in the manner provided for under Sections 256 and 257 of the Constitution of Kentucky, and under the provisions of Section 1459 Kentucky Statutes, Baldwin's 1936 Revision and KRS Section.

"Section 4. The substance of the amendment to be stated on the ballot shall be as follows: Are you in favor of amending Section 246 of the Constitution to read as follows:

" 'The General Assembly, as soon as practicable after the enactment of this amendment, shall regulate compensation of public officials and employees, including those in office and those elected to office at the time of adoption of this amendment; and provide for penalties and what deduction shall be made for neglect of official duties. Thereafter, the compensation of public officials shall not be increased or decreased during the terms for which they are elected or appointed.' " Acts 1942, c. 171.

In order to uphold the amendment, the court, through the majority opinion, was forced to expunge in entirety Sections 3 and 4 from the proposal. It was put under this compulsion by the Legislature which proposed the amendment, and as an integral part of the proposal inserted these sections. The third section, if left in the proposal, destroyed the whole of it; for it demanded that the publication be as under Section 1459 of the Baldwin 1936 revision of the Statutes, a section which had

been revised in entirety by an Act of 1940, c. 38. Section 1459 of the 1936 Baldwin Revision left it to the Secretary of State to frame the question as it should appear upon the ballot. The 1940 Act, current when the proposal was agreed to, now substantially appearing as Section 118.430 of the Revised Statutes, substituted the Attorney General as the author and scrivener of the question. Its requirement went much further than the 1936 Act; for it went into detail as to the contents of the question. It required the Attorney General to ''state the substance of the amendment in the form of a question in a manner calculated to inform the electorate of the substance of the amendment.'' But the mind that conceived and the hand that wrote the proposal before us required that the question to be propounded to the voters should be framed under a nonexistent statute, and by an officer, the Secretary of State, who no longer had the right to formulate the question. The demand of Section 3 therefore, diametrically in conflict with the general Act of 1940, if left in the proposal in judicial construction of it, would inescapably destroy the whole proposal. The accuracy of this statement is evidenced by the majority opinion's deletion of Section 3—if it were not deleted the majority opinion could not have been written. The fourth section as well had to be eliminated to make the majority opinion at all possible. Its vice is in that the proposal itself framed the question in the face of the demand of KRS 118.430 that the Attorney General should frame it. Left in the proposal, it destroyed the whole amendment; and it, too, falls within the deleting action of the majority opinion. I am unable to concur in the reasoning employed in the opinion to justify the deletion of these two integral parts of that whole to which 3/5 of the legislative membership had agreed. In my own sure conviction we have no such power of deletion; and the grounds of that conviction will be stated presently.

It is not untimely to consider the Act of 1940 (now KRS 118.430), and its demand that the question be formulated by the Attorney General. The compelling motive of its enactment is obvious. It was that the Legislature was conscious that the voting public was entitled to clear and informative statement upon the ballot. The dissection of the amendment appearing further along herein will make clear the wisdom of the demand for clear statement. The Legislature of 1940 knew that the Secretary of State need have no legal training, and

that he need have no skill nor aptitude for legal and lucid statement. It knew, too, that the Attorney General is the State's legally trained official, of whom it is demanded that he have at least eight years of practical legal experience; and it selected the State's lawyer to frame the question—and it laid upon him the details of what his question should clarify. But the agreeing 3/5 would not agree that the law of Kentucky should be followed. It would not, and did not, agree that the Attorney General should frame the question. Its recalcitrance involves us in an enigma. The solution of it might be found in carelessness, or even in ignorance of the existence of the 1940 Act, were it not for the enlightening fact that less than three weeks before the agreement to this proposal, this same Legislature had proposed another amendment to the Constitution (one dealing with compulsory compensation), and had provided for its submission upon the ballot in meticulously exact accord with existing constitutional and statutory demands. It is hard to conceive of it that the memories of every one of an hundred and thirty-eight members, and the presiding officers of both houses, could lapse in so short an interval. There is, too, the fact, both inexplicable and remarkable, that the proponents of this proposal did not leave it to the Secretary of State, as under the 1936 revision, to frame the question. It formed, and demanded the use of it, its own wording to go upon the ballot. Are we, or are we not, too imaginative in the suggestion that what was done was done by design, and not by forgetfulness? The impelling motive may be the subject of fair speculation; for when public officials do not follow the plain mandates of the law, the public is justified, is commendable, in making inquiry into the official dereliction. The motive of the sponsors of the proposal in framing the question, it is possible to surmise, was to make its words none too revealing. Whatever the inattention, or whatever design, in the Legislature's own particular framing, its vice was so evident that the majority opinion could not be written save by discarding this Section 4 in entirety.

It is my judgment that there are at least three reasons why the court is not at liberty to discard Sections 3 and 4. They are these:

First. Bearing in mind that the portion of the proposal which the majority discards deals alone with the

matter of publication, let us read what Chief Justice Hobson wrote for the court in McCreary v. Speer, 156 Ky. 783, 162 S. W. 99, 103, thus:

> "The framers of the Constitution intended to leave to the Legislature to determine the form of the publication and the manner of it (that is, whether it should be by handbills, or in the daily press or in the county papers, etc.); and, when the Legislature prescribes the manner of the publication, to ignore its requirement is to ignore the constitutional provision itself."

In the face of the exactitude in the legislative prescription of its own manner and wording of the publication, the majority opinion's discarding of Sections 3 and 4 of the proposal seems to me to do just what Chief Justice Hobson wrote we might not do. Let us repeat his words—"when the Legislature prescribed the manner of the publication, to ignore its requirement is to ignore the constitutional provision itself." The majority opinion does not overrule it. It would hardly be meet for us, set up as a court for this single case, to do so. The majority opinion says that "the authority granted to the General Assembly in connection with amendments to the Constitution is to propose them to the voters." It is apparently under that concept that the majority opinion just dismisses Sections 3 and 4. Section 256 of it provides that when an amendment is proposed, the vote shall "be taken thereon in such manner as the General Assembly may provide." In the face of this clear authority, it is not to be said that the Constitution limits the General Assembly to the proposal of amendments, and denies to it the right to provide how the vote shall be taken. If there were not such power, then KRS 118.430, the general law upon presentations of proposed amendments upon the ballot, would itself be an illegal exercise of legislative power. The difficulty here is that the proposing General Assembly endeavored to substitute by this special law, a special manner of publication, as against a pre-existing general law upon the subject. There was not any want of a legislative right to provide the manner of publication, a right explicitly granted by the Constitution; but there was the want of a right to evade the general law of KRS 118.430. Nor are we to forget Judge Hobson's understanding, and the understanding of the court for which he wrote, that "when the legislature prescribed the manner of the publication" we are not at

liberty to ignore it—which says, as for our immediate thought, that the Legislature has the right to prescribe the manner of the publication. So it seems to me that the entire majority opinion, in the disposing of Sections 3 and 4, disposes of them without right, without regard to what is written in the very words of the Constitution.

Second. There is something else in the Section of the Constitution dealing with amendments that may well give us pause. It is that an amendment is "proposed" in either house; and if it be "agreed to" by 3/5 of the entire membership, it shall be submitted to the electorate; and each man who agrees to the proposal, and each man who will not agree to it, is put upon public record—their individual action must be "entered in full" in the journals of their respective houses. Thus, in the most solemn form, the Constitution put it up to each member to agree or disagree. In ordinary legislation, the voting on many, indeed on a great majority of, the issues is perfunctory. An administration bill (as most of them are in that they are either of administrative origin, or have received administrative approval) comes up for passage, a vote is called, the bill lives or dies, nobody goes on record, only a few know or care. Not so with amendments to the Constitution; for the framers of it put it up to each member to think, and to take his record position, and to agree, or disagree. Under this compulsion, 3/5 of the membership have agreed to all, not part of the four sections of the proposal. The majority opinion says that, while the 3/5 did agree to all of it, and notwithstanding that they did not agree on any of it less than as a unit, it is permissible to destroy the 1/2 part of the agreement, and that it is sound law to bind the agreers by 1/2, the first two sections. And it is sound judgment that we have no right to speculate that the 3/5 are willing to have their agreement, by judicial fiat, cut in half. Their agreement was thus: "We propose this amendment to be voted upon in this way." The majority opinion writes it for the agreers, thus: "We propose this amendment to be voted upon as the Attorney General may put it to the people." Now the 3/5 never agreed to any such thing. They did not mean to let the Attorney General act—for they phrased the question so that, or maybe it were better said, it resulted that, he could have no part in it. And the majority opinion, perforce, has the 3/5 to agree to something to which they did not agree.

So, it is believed by the writer, the entire four sections must stand or fall as a unit.

But if we measure the proposal, as the majority has it, by its first two sections, is it not just essentially and fundamentally bad? Before measuring it, we reflect that the Attorney General, as under the majority opinion, and as under KRS 118.430 must frame the question. The statute is that,

> "The Attorney General shall state the substance of the amendment in the form of a question in a manner calculated to inform the electorate of the substance of the amendment."

The substance of a thing is defined by Webster as, among other things, "essence" and "essential import"; and the word "calculated" as "likely to produce a certain effect"; and the word "inform" as "to communicate knowledge of." Applying these definitions, to make plainer that which is already plain, the Act might be thus paraphrased:

> "The Attorney General shall state the essential import and essence of the amendment in the form of a question in a manner likely to communicate knowledge to the electorate of the essence of the amendment."

In order that what further may be said herein may be better understood, we endeavor to set forth, as under KRS 118.430, the questions that are inherent in the proposal. The Attorney General's phraseology will not meet the statutory demand unless it extends to cover all these, and to permit the voter to express his will upon these, queries inherent in the amendment:

1. Whether he wishes to delete from the Constitution the $5,000 annual salary limitation, without substitution of any other limit therefor.

2. Whether he wishes that the Legislature be ordered to fix and regulate, at their own discretion, the compensation of all public officers.

3. Whether he wishes that there be included in this fixation and regulation those in office when the amendment is adopted.

4. Whether he wishes to forbid the Legislature

thereafter to fix or regulate the compensation of those currently serving the public.

5. Whether he wishes to take from municipalities their right to fix the compensation of their employees, and instead to order the Legislature to fix their compensation.

6. Whether he wishes the Legislature to provide for penalties and deductions for neglect of official duties.

Every single query, in the multiple queries in this outline, is for consideration by the voter. If he votes intelligently, he must make up his mind upon all of them; and yet, in the end, no matter whether his judgment approves some of them, or disapproves of others, he must say yea or nay, must take them all, or must leave them all. The majority opinion concludes that, since all of these elements have to do with compensation, the amendment deals with but a single subject. About that we have these reflections, some of them possibly reconcilable with the majority opinion, but one of them, as it seems, to us, destructive of the conclusion reached by the majority. Now:

The makers of the Constitution considered the salary limitation of $5,000 to be of sufficient individual importance to be set up in a separate numbered section of the Constitution. It is to be found in Section 246.

The Constitution makers likewise set up in a separate numbered section of the Constitution, 235, a prohibition against the change of salaries of public officers during the terms for which they were elected.

These same Constitution framers deemed the matter of the compensation of city, county, town and municipal officers to be yet another separate subject; and interdicted, under Section 161, the increase of their salaries during the terms for which they were elected.

Now, notwithstanding the outlook of the framers of the Constitution upon the subject, notwithstanding their approach to the treatment of public pay, and notwithstanding that these three provisions are made the subjects of independent sectioning, it is not unfair, perhaps, to say, with the majority, that they deal with but a single subject, that of compensation for those who work for the public for pay.

There is in the amendment another "subject" than that of pure compensation. It is inserted so quietly into, and is blended so inconspicuously in, the amendment, that it is not seen—just perhaps because it is too visible, too seemingly in accord with the whole body of the amendment, to invite our scrutiny. But when the entire text is scanned, piece by piece, the fault in its double aspect stands out so that all may see it. Here is the subject extraneous to that of pure salary—the amendment is that the Legislature shall regulate, not only the pay of public officers, as has been (subject to the $5,000 limitation) a legislative right since the adoption of the Constitution, but also the pay of city and town employees who exercise no governmental functions, a right never at any time within the General Assembly, a power which it could not employ constitutionally. The people of Kentucky may prefer that Frankfort shall say what Louisville and Paducah and Leitchfield and Somerset and Georgetown and Carlisle and Mt. Sterling (all for example) shall pay the ash-cart hands, the scrubwomen in the public buildings, the sewer-tenders, the street-cleaners, the firemen, and all others rendering services of this general nature; but if they so prefer, there must be written into the Constitution a new section to take away from these organized localities this power to regulate and govern and run their own local managements, their purely domestic hiring. Let it be borne in mind that, apart from the general regulation of compensation, the amendment includes this new matter, one of distinguishing importance, the subject of changing the form of municipal governments by destroying their right to contract with their employees, at rates fixed by the several cities, and substituting therefor a new element of concentrated power in the General Assembly to say what these several localities must pay for even the most minor services. No such right has ever existed in the Legislature. Let us prove the statement. In City of Lexington v. Thompson, 113 Ky. 540, 68 S. W. 477, 478, 57 L. R. A. 775, 101 Am. St. Rep. 361, the Legislature had passed an act regulating the pay of firemen in second-class cities. Its constitutionality came up to, and was considered by, the whole Court. The opinion drew the distinction between public servants who were, and those who were not, officials. It said of those servants who were engaged as governmental officials, there was the right of legislative salary regulation. Of those engaged in purely employee rela-

tions, it said that no such legislative power existed. The Court said that the question was whether "the act is violative of the right of local self-government by the city in a matter over which the municipality has exclusive control in its private or corporate capacity." The gist of the court's answer is in this quotation from the opinion:

"If the rate of pay to be fixed for such employés is governmental, then, also, is the variety of fire engines to be used, the size and breed of the horses which pull them, the number of fire plugs or cisterns to be established, and the personnel of the force. If the legislature can arbitrarily fix the rate of payment for such services at $65 per month, it can fix it at any other sum which it deems reasonable; and if fixing the pay of firemen is a governmental function because firemen render service in the preservation of the property of citizens of the commonwealth, then it is also a governmental function to fix absolutely the per diem of the street sweepers and the monthly wages of the janitors in the city hall. We do not think such legislative interference in a matter in which no one but the firemen and the taxpayers of the city can possibly be interested could have been in contemplation of the framers of our constitution, or of the voters who sanctioned its adoption."

The opinion concluded thus:

"We do not think the legislature can fix the salaries of firemen, any more than it can fix the pay of street sweepers, the drivers of ash carts, or fix the price per square yard which the citizens shall pay for an improvement of public ways."

Since, as within this rule, the cities now have the right, exclusive of any right in the General Assembly, to fix the pay of their employees; and since the proposed amendment, if adopted, would exactly reverse the present rule, and would erect a totally new method of foreign regulation of their now existing domestic control, it need not be argued that this is a "subject" complete in itself. It is under the ban of Section 256 of the Constitution, a prohibition against the submission of more than two amendments at any one time. The same section provides that "no amendment shall relate to more than one subject." At the time of the adoption of the proposal in question, there had been agreed to the proposal of a

prior amendment dealing with compulsory workmen's compensation, Printed Acts 1942, p. 196. In the dual nature of this proposal before us, plus the employees' compensation amendment proposed, there are three, not two, amendments. It deals with more than one subject. It should not have judicial approval. It is not overlooked that, in Alvey v. Brigham, 286 Ky. 610, 150 S. W. (2d) 935, 938, 135 A. L. R. 1024, it is said that this City of Lexington v. Thompson case had been "considerably threshed around," but that Campbell v. Board of Trustees, 235 Ky. 383, 31 S. W. (2d) 620, "came to the rescue"—which it did, supporting its doctrine by an array of Kentucky cases. Board of Aldermen of Ashland v. Hunt, 284 Ky. 720, 145 S. W. (2d) 814, speaks of it as a "land-mark." Perhaps the sharpest flail was in the criticism of it in Warley v. Board of Park Commissioners, 233 Ky. 688, 26 S. W. (2d) 554, 555, but the court, after administering the criticism, was fair and careful to add:

> "This does not mean the General Assembly may legislate on fiscal affairs and other matters of purely municipal concern."

Then, too, this Warley case itself was dissected in the Campbell case; and the court expressly adhered to the doctrine of the Thompson case. In the end, City of Lexington v. Thompson is the law of Kentucky, unquestioned in its strict and narrow rule that the fiscal affair of fixing the pay of its public employees (as set over against its officers) is a city, and not a state, adjunct and right. The constitutional destruction of that right of local self-government is assuredly a subject in itself. It is an alteration in the resting-place of the right to fix the pay.

The majority opinion says that "there is no other subject embraced in the proposal other than the regulation of the compensation of public officials and employees"; and that it does not, therefore, infract the Constitution's ban against more than one subject. The argument is too narrow for acceptance. Pay for public service is an incident to all such service; but it will not do to say that every species of governmental functions may be altered by a single amendment, by the device of inserting in the amendment a provision for the fixation of pay. That concept would permit many subjects to be included in a single amendment.

We are in accord with the opinion of the majority, and the cases cited in it, that a constitutional section may be repealed by the adoption of a contrary amending section; but we have no such case here in this matter of local employee pay. What it presents is the conferring upon the General Assembly, by this amendment, a power that it never had before, and the taking away from municipal governments, by this same amendment, powers that they have exercised ever since, and historically long before, the adoption of the Constitution.

Perhaps Curry v. Laffoon, 261 Ky. 575, 88 S. W. (2d) 307, should have something of attention, since the majority opinion says that it is like the instant case in principle. We do not find it so. In that case the subject of the proposed amendment was the single one of liquor control. The amendment as proposed (see Acts of 1934, c. 58, p. 177) was captioned so as to leave to the voters the right to say whether the State-wide law should be repealed and the local-option law be substituted for it. The body of the proposal was in strict accord with the caption. The question, as it appeared upon the ballot, was likewise in accord. The voter had his choice; and, as is said in the opinion, he had his clear option between the two alternatives, to preserve the prohibition amendment, or to substitute local option therefor, a single question. Both the State-wide law and the local-option law could not stand contemporaneously. Here the right in the towns to control their employees' pay, and the right of the General Assembly to control the pay of public officers, can stand, and in fact have long stood, contemporaneously. Since they are not in contradistinction, but present, for the voters' consideration, (a) whether they are willing to abrogate the $5,000 limitation, and to abrogate the rule against salary alterations during current official terms, and (b) to take from the towns their right to control their own hirings, it is rather inescapable that the amendment deals with more than one subject, and therefore falls within the ban of Section 256. A voter in a city or town might be willing to waive the $5,000 limitation, and grant the legislative right to alter the pay of those in office; but he might, and doubtless would, reject automatically any grant to the Legislature of the right to say what his city should pay its street sweeper. In the proposal before us he must accept both, or reject both—it is not allowed, as the Constitution demands, that he have "a separate vote on each."

And is it not inescapable that there are these three amendments, one in excess of the constitutional allotment, in the offing for the November, 1943, election—(1), an amendment dealing with workmen's compensation,. (2) an amendment voiding the $5,000 official salary limitation, and a bestowal upon the General Assembly of the right to regulate such salaries, and (3) the rape of city governments of their inherent right (City of Lexington v. Thompson, supra) to manage the fiscal ends of their own employments? If the answer be in the affirmative,. and it is my judgment that it should be so, the judgment. here would need to be affirmed.

There are certain other reflections that impinge upon, and that merit something of weight in testing this proposal. A demand of Constitutional Section 256 is. that amendments "shall be so submitted as to allow a separate vote on each." Taking full stock of the absolutism of the majority's opinion's declaration that there is only a single subject, that of compensation, dealt with in the amendment, we are yet constrained to wonder about the soundness of that conclusion. To illustrate:

The proposal is that the Legislature shall "regulate" compensation. Is it enlightening in this form? Is it fair to the voters? What is the essential nature,. and what is the purport, of this amendment? It is to remove from the Constitution of Kentucky, in toto, the prohibition of Section 246 of the Constitution that no public officer other than the Governor shall receive more than $5,000 per annum. There is no information, in the General Assembly's formulated amendment, as to the removal of this limitation,. a limitation with which all informed people of Kentucky have long been familiar, a limitation which long has been the subject of public interest in the press, and of editorial comment, and of judicial consideration. The proposal is merely that the General Assembly shall "regulate" compensation of public officials. It is not unfair to assume that the voter, coming to reflect upon the question upon which he was to express his will, might very well assume that this "regulation" left in full force and effect the $5,000 prohibition,. and that the regulation which should be exercised by the General Assembly, if the amendment were adopted, was a regulation yet subject to that constitutional top bracket. So the proposal thus formed was not calculated to tell the people of Kentucky that a vote in the affirmative

was to discard the $5,000 limit, or that a vote in the negative was to retain it. Again, and somewhat by way of repetition, it may be questioned gravely whether the use of the word ''regulate'' clarifies and makes patent the real purpose of the amendment. To fix, to set, the amount of the pay of the Governor, or of a school janitor, without limit up or down, is one thing, a thing which knows no limit. To regulate the pay in no sense excludes the idea of bottom limits, and top limits, on the salaries of the Governor, or the janitor, either statutory or constitutional; for the regulation might very well, in its intendment, be the adjusting of the salaries of the different officials as within these brackets; and the use of the word itself is concealing, rather than informative.

The form of the proposal as submitted is an enigma which neither speculation nor reason will solve. As remarked above, there was submitted by the same Session another amendment, one relating to compulsory workmen's compensation. It is to be found at page 196 of the Printed Acts 1942. It is clear in its text. While it provides the manner of its publication on the ballot, its demand was that the publication be under the exact present constitutional and statutory law. It said that it should be submitted in the manner provided by Sections 256 and 257 of the Constitution, which was exactly as it should be; and that it should be submitted in the manner provided by Chapter 38 of the Acts of the General Assembly of 1940, which, again, was exactly as it should be, because that was then the general statute governing publications, the one providing for the formation of a lucid question by the Attorney General and that if the Revised Statutes were adopted, the publication should be as under KRS 118.430, which was exactly as it should be— for at that time the Revised Statutes had not been formally adopted, nor were they to be effective until October 1st of 1942. We recite these publication provisions as to that particular amendment because they evidence that the General Assembly, or at least some of its lawyer members, both understood and desired to abide by the law as it then was and our enigma is in the inexplicability of the Legislature's proposing at the same Session, to be voted upon by the same members of the House and the same members of the Senate, under the guidance of the presiding officers of both bodies, the proposal before us, with that illegal demand for a publication under a question formulated by the General Assembly itself, that de-

mand which the majority opinion had to delete by a judicial expunging. In so far as our duty is concerned, it is of small consequence as to whether this particular proposal, with its regrettable concealing form, was the result of oversight or the result of design; for our duty is to determine whether the proposal can have judicial approval as a compliance with the Constitution and statutes of the State; and the writer's judgment cannot approve. The conclusion has not been easy. It is the duty of all judges to lay aside, in the construction of statutes and constitutions, their own predilections, and their own conclusions, upon whether this statute or that constitutional section might be wise or desirable. The late Justice Cardozo, in his book ''The Nature of the Judicial Process,'' wrote that ''there is in each of us a stream of tendency, whether you choose to call it philosophy or not, which gives coherence and direction to thought and action. Judges cannot escape the current any more than other mortals.'' For many years the Bar Association and the justminded and informed members of the public have sought to put an end to the unfair $5,000 top bracket of Section 246. It was written into the Constitution as of the current times and conditions of the early 1890's. A dollar of that day would buy, as under the memories of those of us that go back that far, twice or thrice or many more multiples of what it will buy today. A homely illustration will best put the thought: then spring chickens, big or little, just chickens, were $1.25 or $1.50 per dozen. They are no longer plain chickens, but broilers or friers, at a cost of around $9 per dozen. There are untold like illustrations, in the cost of clothing, foodstuffs, domestic help, and the many complex things now essential to our comfort. In the writer's judgment the preservation of the limitation of 1891 is inexcusably unfair to our higher officers. As within Judge Cardozo's concession of a certain innate bias in all of us, the writer was swayed toward concurring with the majority. But there were other reflections which, within this same biased tendency, had their balancing weight the other way. It may be questioned, gravely questioned, whether the Legislature's proposal did not go too far. The naked result of the amendment, if adopted, is that the General Assembly, from Governor to janitor, may fix the pay without limit; and we may well envision a time when, under the impulse of political expediency, the power might become an iron to rake many a coal out of the fire. It very well may be

that the public will be unwilling to let down the bars, and to permit the tide of the moment or the expediency of the moment, to be without limit in raising public pay. It well may be so far objectionable, in this unlimited possible uplift of pay, in one upward regulation after another, that the voting public will have none of it. As well, it is sure to be well arguable that no voter of any city or town, when informed upon the subject, will ever assent, by his vote, that the right of these municipalities to hire their own employes, under their own fixed budgets, at their own contracts and fixation of pay, shall be ceded to Frankfort, and made the football of legislative politics. So it may result that those who framed and designed the concealing contents of the proposal have done the cause a distinct disservice. If the proposal be defeated in November, at the election to be held under the majority opinion's interpretation of the proposal as decimated by it, the question can not be proposed again until some election to be held five years after November, 1943. Constitution, Section 256.

It is fundamental that, in the making of a constitution, or in the alteration of it afterward, the power of the public is supreme. It is equally true that, as a corollary of this power, it is requisite that when the public comes to act, it should be, and it has the right to be, informed in the clearest and most unequivocal way of the intent of what is presented to it—presented to it so that it need not accept what it does not like in order to get what it does like. The proposal, duplicitous in the ways portrayed above, requires that the public take all, or reject all. It denies the constitutional demand that a separate vote be "allowed on each." It does not justify the writer's approval.

What is written here is written out of a compelling conviction. It is said with the utmost respect for the able and concurring majority.

ADDENDUM: Since the preparation of the foregoing, the court's opinion through the majority has been modified, with the result that certain matter appearing in the foregoing is responsive to positions not appearing in the amended opinion. Thus:

The original opinion discarded both Sections 3 and 4 of the amending act. Upon the modification, only Section 4 appears to have been eliminated. The modifica-

tion specifically treats of Section 3 as a component part of the act. It says "By Subsection 3 of the Act, the General Assembly invoked the machinery of its general act, which in Subsection 4 it ignored." Then the modification holds that the submission of the amendment under KRS 118.430 is a compliance with Section 3—but it is unmindful, or disregardful, of the fact that in Section 3 there was demand that the submission be under a method provided by two discordant statutes, and not by one homogeneous statute. The modification says that Section 118.430, Kentucky Revised Statutes (the statement is parenthetically made), was formerly Section 1459 of the Baldwin Revised Statutes, 1936 Edition. Just what is the intendment of this statement is obscure; for if the statement means merely that the section numbering was the same, it is erroneous, because of the wholly new method of section numbering employed in the Revised Statutes; and if it means that Section 1459 of the 1936 Edition is the same in intent as Section 118.430 of the Revised Statutes, the statement is in error, and this because Section 1459 of the 1936 Edition provided that the Secretary of State should state the "substance" of the amendment for its appearance upon the ballot, while, per contra, the Section 118.430 of the Revised Statutes lays this same exact duty upon the Attorney General. If the court is at liberty to discard either of these two contrary methods, it might very well be said that it has discarded the one for which exact and definite demand was made, Section 1459 of the Baldwin Revision of 1936, and has adopted a method appearing in Section 3, no more definitely stated, pointing to no more exact statutory citation, than KRS—a citation of a compilation of statutes not in effect when the amendment was proposed, with no section number given to it, and even with the letters transposed in the designation of the future statute. As against the majority's conclusion, there is repeated this from McCreary v. Speer, 156 Ky. 783, 162 S. W. 99, 104, supra:

> "When the Legislature prescribed the manner of publication, to ignore its requirement is to ignore the constitutional provision itself."

The opinion as amended says that the court is "not called upon to decide" whether the amendment, if ratified by the people, will extend to create a legislative right to deal with salaries of municipal employees. Since one

of the questions, if not indeed the major question in the whole matter, was whether a constitutional conferring of such a right upon the Legislature was not a separate subject or amendment in itself, would it not seem that the court had an obvious and impelling duty to perform in deciding this question? Notwithstanding the declaration of the court that it was not called upon to decide the question, the court cites Talbott v. Public Service Commission, 291 Ky. 109, 163 S. W. (2d) 33, as holding that "employees" were within the salary limitation of Section 246; but the opinion fails to remark that that case dealt alone with State employees, whose pay has forever past been within the authority of the General Assembly, and had naught to do with the pay of municipal employees, whose pay was never within, but has been declared to be constitutionally without (City of Lexington v. Thompson, supra), any legislative control.

It is hoped and believed that there need be no apology for this extension; since, perforce, it is fair that the dissenting opinion, as the last word upon the subject, should extend to cover the final expression of the court through the majority.

I am authorized to say that Judge Bradley concurs in the above opinion and its addendum.