Leslie W. PERKINS, Appellant,

v.

CITY OF FRANKFORT, Kentucky, et al.,
Appellee.

Court of Appeals of Kentucky.

March 11, 1955.

450

Funk, Chancellor & Marshall, Thomas F. Marshall, Frankfort, for appellant.

Charles L. Hobson, Marion Rider, Frankfort, for appellees.

MOREMEN, Justice.

This is an appeal from a judgment of the Franklin Circuit Court which declared valid (1) ordinances of the City of Frankfort (hereinafter called City) providing for the issuance by the City to the Electric and Water Plant Board of the City of Frankfort (hereinafter called Board) of revenue bonds to obtain funds to finance the acquisition and construction by the City of a hospital building, recreational and parking facilities, and (2) a resolution of the Board providing for the issuance of its revenue bonds to obtain funds with which to purchase the bonds to be issued by the City.

In 1943, the City acquired, by means of revenue bonds at a cost of about $1,200,000, electric and water facilities which served Frankfort and its vicinity and which had theretofore been privately owned. At the time there were special statutory provisions for separate operation of electric and water properties but no particular acts which applied to a combined operation. It was conceived that perhaps under KRS 96.550 to KRS 96.900, popularly called the T. V. A. Act, a combined operation was permissible. The operation was set up on this theory and was approved in Cawood v. Coleman, 294 Ky. 858, 172 S.W.2d 548.

At the 1946 session of the General Assembly there was enacted KRS 96.171 to KRS 96.188 which gave specific statutory authority to the operation of combined utilities and it is these sections under which the Board now operates. Under the statutes the Board consists of five citizens, tax payers, voters, users of electric energy or water and "Said board, when so appointed, and qualified, shall be and hereby is declared to be a body-politic and corporate, with perpetual succession; and said board may contract and be contracted with, sue and be sued, in and by its corporate name, and have and use a corporate seal." KRS 96.172. It may "acquire property, real and personal, tangible and intangible, necessary or incidental to the proper conduct of its business." KRS 96.175. The title to any property, real or personal, which the Board may acquire "shall vest in the municipality for the use and benefit of the electric and water system." Subsection (7) of KRS 96.175. The whole purpose of these sections seems directed at giving autonomy

to the Board whose termination of operation may be accomplished only upon affirmative vote of two-thirds of all the qualified voters voting in an election where that question has been submitted to them.

The 1946 act permitted the Board to issue revenue bonds, but with the limitation that surplus revenues should be used only for (1) retirement of bonds, (2) improvement and extension of the systems, or (3) reduction of rates.

Early in the year 1952, it became apparent that the Board was in excellent financial condition and in that year's session of the General Assembly KRS 96.182 was amended with respect to the limitation on the specific use of surplus funds so that the Board was authorized to finance, by revenue bonds, public projects of the *Board,* under Chapter 58 of the Kentucky Revised Statutes, subject only to approval by the City. The converse was, of course, that it could not finance public projects of the City alone.

In order to extend the Board's power, KRS 96.182 was again amended during the 1954 session of the General Assembly and it now reads in part:

"* * * the board, after the original cost of the property shall have been fully paid and satisfied may, in its sole discretion, use, apply and pledge all or a part of such surplus revenues for the acquisition, construction, maintenance, improvement, addition to and operation of any 'public project' as the same is defined in subsection (1) of KRS 58.010, or for the purpose of *purchasing, paying, retiring, guaranteeing the payment of or underwriting revenue bonds issued by the city* or any agency thereof to finance the acquisition, construction, maintenance, improvement, addition to and operation of such 'public project', which 'public project' shall be located within the territory served by the board; the board is hereby vested with all of the powers, duties and responsibilities delagated and granted to a 'governmental

agency' under KRS 58.020 to 58.140, both inclusive; provided, however, that the acquisition or construction of any 'public project' as above defined, shall be first approved by the common council before such 'public project' is undertaken."

In order to utilize the power given, the City and the Board have worked out this plan for the ultimate improvement of the community:

The City proposes to issue revenue bonds in the following amounts for these purposes: (1) $350,000 to be used in acquiring, constructing, maintaining and operating a municipal hospital; (2) $200,000 to be used for an off-street parking project; and (3) $500,000 for recreational projects. We suppose the range of judicial vision will not be unduly enlarged if we take notice that such projects are not usually classified as "money makers," and, since the bonds are secured only by revenue from them, it is doubtful whether they could be sold on the open market.

The Board, in exercise of its right to use its surplus revenues for the purpose of purchasing, paying, retiring or underwriting revenue bonds issued by the City in connection with any public project within the meaning of Chapter 58 of the Kentucky Revised Statutes, proposes to issue its revenue bonds in the sum of $1,050,000, and with the proceeds of these bonds will be purchased the City's revenue bonds. The Board's surplus funds will be pledged to the payment of its own bonds and, after purchase, the bonds of the City will be hypothecated as additional security.

That portion of the Board's resolution, which pertains to the Board's covenant to pledge its surplus revenue, reads:

"* * * that so long as any of the bonds hereby authorized are outstanding the electric and water properties under its control shall be continuously operated and maintained as a revenue producing and self-liquidating undertaking; that a schedule of rates and charges for the services and facilities

of said electric and water properties will at all times be fixed and revised from time to time so that the income and revenues derived from the operation thereof will be sufficient (1) to pay all expenses of operation, maintenance and repair of said properties; (2) to pay the interest and sinking fund requirements for account of any revenue bonds that may be hereafter issued for improvements, extensions, enlargements or additions to said properties as hereinafter permitted and provided; (3) to maintain a depreciation fund for account of said properties in book value of said properties; (4) to maintain a cash working fund equal to one twelfth of the gross income and revenues of said properties during the preceding fiscal or calendar year; (5) to pay all other obligations authorized and incurred by the Board in the operation and maintenance of the properties and the furnishing of services and facilities thereby; (6) to pay such taxes, if any, as the Board may elect to pay to the city under the provisions of Section 96.179 of Kentucky Revised Statutes, and (7) *leave a surplus of income and revenues from the twelve months preceding each June 30 (such surplus being sometimes in this resolution referred to as 'surplus income and revenue') of not less than $54,745, to be paid, if necessary, into the 'Revenue Bond and Interest Redemption Fund,'* as hereinafter more specifically provided."

It is apparent that this resolution obligates the Board, until the day when all revenue bonds are retired, to charge rates to electric power and water consumers that are in excess of the amount usually necessary for a normal operation of the facilities in accordance with strict principles for good operation of publicly owned utilities because insofar as a surplus of $54,745 per year is guaranteed, it is an additional charge upon the consumer for a benefit which will not redound to his particular class alone. It must be remembered that this is not a tax levied according to a general classification upon tax payers as a whole, but the rates charged are merely the purchase price of a commodity sold. However, no question has been raised which concerns the constitutionality of such an arrangement, probably because we have in the past, at least tacitly, approved such procedure.

In McKinney v. City of Owensboro, 305 Ky. 253, 203 S.W.2d 24, the proposed bonds to be issued under Chapter 58 of the Kentucky Revised Statutes recited that the principal and interest were to be paid out of the revenues received from the project which were to be supplemented by any excess revenues received from the city's electrical plant over and above that which might be necessary to meet the operating costs, maintenance, depreciation and sinking fund requirement to retire the bonds upon the electric plant. It was further recited that so long as any of the issues were outstanding, no other bonds or obligations should be made payable from the excess revenue of the municipal electric plant without making them subject to the priority of the bonds under consideration in the case. An examination of the proposed bond, which was filed as an exhibit in the McKinney case, shows that it contained this provision:

"Said city covenants that said public project will be continuously operated as a revenue producing undertaking and that it will fix and charge such rents, fees, rates and charges so that the revenues derived therefrom will be sufficient to pay all of said bonds and interest thereon as the same become due, and to pay the costs of such operation which are not otherwise provided."

The foregoing covenant, of course, guarantees that rates will be fixed at such an amount that a constant surplus will be guaranteed.

In Williams v. City of Barbourville, Ky., 246 S.W.2d 591, where the revenue bonds were proposed for a project under which the existing water and electric system would be combined with a new sewer

system, the proposed bond contained a provision identical with the one above quoted.

In City of Hazard v. Salyers, 311 Ky. 667, 224 S.W.2d 420, where it was proposed that revenue bonds be issued for the purpose of defraying the costs of improving the city's water system and of acquiring land and erecting a municipal field house with a swimming pool and other recreational facilities, the bonds to be paid out of the revenues received from the project and any funds or tax revenues available for general purposes of the agency were approved and, there, too, the proposed bond contained a provision which was, mutatis mutandi, the same as that above quoted.

Furthermore, Chapter 58, which concerns the issuance of revenue bonds for public projects, specifically requires that artificial surpluses must be created in order to pay the interest upon all bonds and a sinking fund to pay the principal and, in the event of failure so to do, a receiver may be appointed to effect that end. KRS 58.060 and KRS 58.070.

The appellant has specifically urged these grounds for reversal: (1) Title to the Act of 1954 violates section 51 of the Constitution, (2) the Act constitutes special legislation, (3) the public projects are insufficiently described in the ordinances, (4) the provisions of the ordinances and the resolution, first above mentioned, constitute an unlawful attempt to bind future councils and boards as to rates to be charged for services, (5) the bonds create a debt in violation of sections 157 and 158 of the Constitution, (6) the bonds provide for a private sale of the bonds for a negotiated price and are therefore invalid, (7) the proposed contract with the Silent Workers Circle of the Kings Daughters and Sons, Inc. for the operation of the municipal hospital is an unlawful delegation of power, (8) the bonds of the City which the Board purports to buy do not constitute a prudent investment. We will discuss these arguments seriatim under the same numerical headings:

■ (1) Title to chapter 249 of the Acts of 1954 reads as follows: "An Act relating to utilities in cities of the third class, and amending Sections 96.182 and 96.184 of the Kentucky Revised Statutes." In Hatcher v. Meredith, 295 Ky. 194, 173 S.W.2d 665, we held that if the title of an act sets out the number of the section to be amended, the act sufficiently accords with the constitutional provision requiring the subject of an act to be expressed in the title.

■ (2) This same contention was urged in Settle v. Jones, 306 Ky. 9, 206 S.W.2d 59, in regard to the combined utility operation in the City of Frankfort in connection with Chapter 212, Acts of 1946, and was there rejected.

■ (3) KRS 58.020 provides:

" * * * Any governmental agency other than agencies of the state government may borrow money and issue revenue bonds under KRS 58.010 to 58.140 pursuant to an order, resolution or ordinance of its legislative or administrative body, which order, resolution or ordinance shall set forth the proposed public project, the amount of the revenue bonds to be issued and the maximum rate of interest. In every instance the order, resolution or ordinance shall provide that the public project is being undertaken under the provisions of KRS 58.010 to 58.140."

We have examined the provisions of the ordinances of the proposed public projects and are of opinion that they meet the requirements of the above statute which seem to require only that the description be sufficient to enable a later determination that the funds were in fact used for the development of such projects. Necessarily such projects cannot be exactly described because, in most instances, the ultimate acquisition of them is dependent upon obtaining funds from the sale of the bonds. We think the general descriptions given us were sufficient.

■ (4) In the first part of this opinion, in connection with another phase of the

454

case, we discussed the question of future obligation to create surpluses and pointed out that such a procedure had been approved in several cases. See also City of Bowling Green v. Kirby, 220 Ky. 839, 295 S.W. 1004; Eagle v. City of Corbin, 275 Ky. 808, 122 S.W.2d 798; and subsection (3) of KRS 96.175 where express authority is given.

■ (5) This court has held on a number of occasions that where bonds are payable solely from revenues, other than taxes, and are not secured by lien on physical properties, such bonds are not an indebtedness within the meaning of sections 157 and 158 of the Constitution. Klein v. City of Louisville, 224 Ky. 624, 6 S.W.2d 1104; McKinney v. City of Owensboro and Williams v. City of Barbourville above cited.

■ (6) In this connection, appellant relies upon Eagle v. City of·Corbin, 275 Ky. 808, 122 S.W.2d 798, where it was held in connection with a particular statute that a city council had a broad discretionary power in the creation and sale of revenue bonds, but not to the extent that it could avoid the impact of the general public policy of this state which requires municipal corporations, in most instances, to dispose of public property by competitive bids after reasonable advertisement of the sale. However, the public policy, as announced by the court, may be changed in most cases by acts of the legislature, which was done here, because the·Act of 1954, KRS 96.182, gives specific authority to purchase the bonds under conditions such as exist here.

■ (7) In connection with this contention, appellant relies upon Booth v. City of Owensboro, 274 Ky. 325, 118 S.W.2d 684, in which the court found that the city was in effect taking a private corporation into partnership with it for the conduct of a public enterprise. However, when that same case returned to this court, 275 Ky. 482, 122 S.W.2d 111, under a proposed contract and lease by which the completed hospital would be leased and operated by another, the court approved that arrangement.

■ (8) KRS 96.182 gives complete authority to the Board to make such an investment as is contemplated here.

The judgment is affirmed.